**ALYESKA PIPELINE SERVICE COMPANY, Appellant,**

v.

**Mabel V. DeSHONG and the Alaska Workers' Compensation Board, Appellees.**

No. S–10083.

Supreme Court of Alaska.

Oct. 3, 2003.

Michael A. Budzinski, Russell, Tesche, Wagg, Cooper & Gabbert, Anchorage, for Appellant.

Mabel V. DeShong, pro se, Fairbanks.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A worker filed a claim for worker's compensation after injuring her elbow while working for her employer. Therapy did little to alleviate her condition, yet she did not undergo surgery until two years later after changing doctors. Before undergoing that surgery, the worker was laid off by the employer. She applied for total temporary disability benefits from the time of her lay-off to the date of her ultimately successful surgery. She overcame a presumption of medical stability and was awarded benefits even though she received unemployment benefits for part of the claimed period. Because the Workers' Compensation Board did not err in finding that the worker overcame the presumption of medical stability, and because receipt of un-employment benefits does not absolutely bar temporary total disability benefits if the unemployment benefits are paid back, we affirm the decision of the superior court that affirmed the decision of the board.

## II. FACTS AND PROCEEDINGS

### A. Facts

Mabel "Tiny" DeShong was an administrative assistant for Alyeska Pipeline Services Company (Alyeska) when she filed a report of occupational injury or illness with the Alaska Workers' Compensation Board (board) on January 11, 1998. She alleged that her job-related use of a computer mouse resulted in right elbow joint pain.

DeShong's first doctor, Robert D. Dingeman, M.D., diagnosed her as having activity-related right dominant elbow medial condylitis on January 13, 1998. Dr. Dingeman fitted her for a splint, arranged for physical therapy, and discussed the possibilities of cortisone injections and surgery. Alyeska arranged for an ergonomic workstation evaluation, and then implemented the recommendations of the evaluation, modifying DeShong's work environment in an effort to alleviate her symptoms.

Following several rounds of therapy and use of the improved workspace, DeShong was doing considerably better at her April 1998 appointment with Dr. Dingeman. At that time, she told him that she did not want cortisone injections. In June 1998 Dr. Dingeman stated that she ought to consider having surgery in the future. He placed DeShong's arm in a cast for two weeks. Because of her objections to surgery, Dr. Dingeman stated in August 1998 that she was not a surgical candidate, but he recommended that she obtain a second opinion by an orthopedist within two weeks.

In September 1998 Dr. Dingeman again recommended that DeShong be evaluated by one of the two hand surgeons in Anchorage, though she was "rather determinedly a non-surgical candidate as yet." In the same September 1998 report, Dr. Dingeman said, "I would state again for the record my recommendation that she be evaluated further by

one of the two hand surgeons in Anchorage soon."

In October 1998 Alyeska requested that DeShong be evaluated by Dr. Michael Gevaert pursuant to an employer-sponsored independent medical evaluation (EIME). Dr. Gevaert diagnosed her as having chronic medial epicondylitis. He found that twelve weeks of physical therapy had failed to produce favorable results and noted that she did not want to consider steroid injections. Dr. Geveart, therefore, found that she had reached medical stability[1] and recommended a functional capacity evaluation to determine her permanent work restrictions.[2]

DeShong returned to Dr. Dingeman in November 1998 because she continued to experience pain and discomfort in her arm. Dr. Dingeman found her lack of improvement over so many months to be of concern. He speculated as to surgical exploration but recommended that such consideration "be deferred until after any disposition process occurs."[3]

In December 1998 DeShong was laid off by Alyeska. During her visit on January 19, 1999, Dr. Dingeman noted that she had "reached 'statutory stability' [but had] not reached clinical stability in the natural course and progression of her condition."[4] Such progression, Dr. Dingeman stated, could last up to eighteen months. DeShong asked whether she should obtain an additional opinion, and he endorsed that idea for "disposition purposes."

DeShong was again seen by Alyeska's doctor, Dr. Gevaert, in April 1999. Dr. Gevaert, finding no significant functional change since October 26, 1998, said that she remained medically stable. As DeShong had undergone a physical capacity evaluation that concluded that she could perform her usual and customary job, Dr. Gevaert found there to be no permanent work restrictions.

The question whether DeShong was entitled to a second opinion took on great importance. While she was being treated, DeShong expressed her desire to both Alyeska and Dr. Dingeman that she obtain a second opinion from a doctor of her choice. She did not obtain a second opinion until August 1999, after Dr. Dingeman had found her to be medically stable.

There was substantial confusion on the part of DeShong and Dr. Dingeman over whether or not DeShong was entitled to a second opinion. In July 1999 DeShong filed a claim with the board alleging that Alyeska had denied her request for authorization to visit another doctor for a second opinion. DeShong alleged that she was told by Alyeska that the company had already paid for a second opinion, that of Dr. Gevaert. DeShong also asserted that she was told by Alyeska's representative that she would still be able to have a second opinion by a doctor of her own choice if she saw Dr. Gevaert. Alyeska replied by asserting several affirmative defenses, including that Dr. Dingeman was DeShong's treating physician and that he had not referred her for a second medical opinion. Dr. Dingeman, however, thought that it was Alyeska's responsibility to arrange a second opinion. Dr. Dingeman noted in July 1999 that

---

1. Medical stability is defined by AS 23.30.395(21) as "the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment." Medical stability is "presumed in the absence of objectively measurable improvement for a period of forty-five days; this presumption can be rebutted by clear and convincing evidence."

2. Although he found that DeShong had reached medical stability, Dr. Geveart apparently believed that the chronic nature of her injury might require adjustments to her work environment and duties.

3. It is unclear what Dr. Dingeman meant by "disposition process." He may have been referring to the disposition of her worker's compensation claim before the board, believing that surgery should be delayed until the board had heard her claim for benefits.

4. It is unclear what Dr. Dingeman meant by "statutory stability" and "clinical stability." Taken in context, the whole sentence seems to suggest that although DeShong had reached a period of forty-five days with no measurable improvement, the degeneration of her elbow would continue over the next eighteen months before stabilizing.

[s]omehow the patient has the impression that the previously recommended second opinions and consultations can be facilitated through this office. It was shared back that typically the carrier must make those arrangements with the doctors who consider and accept such cases. Usually the adjuster/rehabilitation specialist obtains the physician and provides them with a list of clinical and administrative questions to be addressed, and that there are circumstances making availability of physicians for these types of evaluations available is known to both the adjusters and the board. The circumstances by which these challenges arose in the last year are not within the power of this individual office to alter or facilitate.

Although Dr. Dingeman had requested that DeShong be evaluated by a specialist on several occasions, he told DeShong that such arrangements needed to be made through Alyeska. This is incorrect. By law, Dr. Dingeman could have referred DeShong to another doctor for further evaluation.[5] When DeShong requested permission from Alyeska to obtain a second opinion as Dr. Dingeman advised her to do, Alyeska denied the request. When DeShong was made aware that she could change physicians at the prehearing conference before the board, she did so.

DeShong saw Dr. Carl Unsicker, who diagnosed her as having medial epicondylitis[6] and possible ulnar entrapment.[7] He recommended a nerve conduction study[8] and a reevaluation for surgery. Dr. Jeremy Becker reviewed the results of the nerve conduction study and concluded that DeShong suffered from mild median neuropathy[9] in the right wrist with significant ulnar neuropathy[10] in the right elbow. Upon receiving Dr. Becker's recommendation of surgery, DeShong consented and surgery was successfully performed on September 15, 1999.

Until DeShong's surgery, Dr. Dingeman allowed her to continue working in a light duty capacity. Alyeska had been accommodating DeShong's work restrictions until she was laid off on December 27, 1998. After being laid off, DeShong sought and received unemployment benefits until her surgery, at which time Alyeska began paying Temporary Total Disability (TTD) benefits for the period of surgery and recovery.

### B. Proceedings

In July 1999 DeShong filed a claim for TTD benefits from the time of her layoff in December 1998 through that date. DeShong testified at the March 2000 board hearing that she wanted to repay her unemployment benefits and instead receive TTD benefits from the time of her layoff to the date of her surgery. The board considered whether DeShong was entitled to TTD benefits for the time between her layoff and surgical treatment.

Alyeska contended before the board that DeShong was ineligible for benefits as she had reached medical stability during the claimed benefits period. The board found that although Dr. Dingeman considered

---

5. AS 23.30.095(a).

6. Medial epicondylitis refers to the inflammation of the tendons on the inside of the elbow. *See* http://www.intelihealth.com (last visited Aug. 18, 2003).

7. Ulnar entrapment occurs when pressure is placed on the nerve that runs down the inside of the elbow, causing pain in the elbow or wrist. *See* http://www.emedicine.com/orthoped/topic574.htm (last visited Aug. 18, 2003).

8. A nerve conduction study is used to document the extent of nerve damage by measuring the rate at which electrical impulses move along a nerve. *See* http://www.neurologyhealth.com/ncs.htm (last visited Aug. 18, 2003).

9. Median neuropathy occurs when the median nerve in the wrist, which runs through the wrist bones and ligaments which compose the carpal tunnel, is compressed, causing tingling, numbness, weakness, or pain in the fingers, hand, forearm, and/or elbow. It is commonly referred to as carpal tunnel syndrome. *See* http://www.emedicine.com/neuro/topic208.htm (last visited Aug. 18, 2003); http://www.intelihealth.com (last visited Aug. 18, 2003).

10. Ulnar neuropathy refers to an injury of the nerve along the inside of the elbow resulting in muscle weakness, pain, numbness, redness, and/or burning or tingling sensations. *See* http://www.neurosurgeon.com/conditions/ulnar_neuropathy.htm; http://my.webmd.com (last visited Aug. 18, 2003).

DeShong to be medically stable, there was no dispute that she had improved after surgery. Because Dr. Dingeman had consistently recommended a second evaluation throughout his treatment and because DeShong improved after surgery, the board found that DeShong had produced clear and convincing evidence of no medical stability. The board accordingly found that DeShong was entitled to TTD benefits through the period of disability.

Alyeska also argued that DeShong remained legally ineligible for TTD benefits because she had collected unemployment benefits while she was laid off. The board found that DeShong had clearly disclosed her worker's compensation work limitations on her unemployment application. Since she was unable to find work that fit her restrictions, the board found that her injury precluded her from finding a job in the real market. Provided she pay back the unemployment benefits she received from December 29, 1998 to September 15, 1999, the board found she was eligible for TTD benefits during that time.

Alyeska appealed this decision to the superior court. Superior Court Judge Fred Torrisi found that Dr. Dingeman did not understand that DeShong had a legal right to a second opinion, nor did DeShong. Given DeShong's ambivalence towards surgery and Dr. Dingeman's finding that she had not reached "clinical stability," the court found that "a reasonable mind could accept that DeShong had not during these months reached statutory stability, and that her surgery was delayed due to her ignorance of her right to a timely referral [for a second opinion]." The court therefore upheld the board's decision to award TTD benefits.

The superior court next considered whether payment of unemployment benefits constituted an absolute bar to DeShong's receipt of TTD benefits. It found that interpretation of the unemployment statute was within the board's expertise and that the board's interpretation was reasonable, and it concluded that the statute does not present an absolute bar to receipt of TTD benefits. The court therefore affirmed the decision of the board to allow DeShong to receive TTD benefits provided she return her unemployment benefits. Alyeska appeals.

## III. STANDARD OF REVIEW

When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review and directly scrutinize the merits of the board's decision.[11] Factual findings made by the board are reviewed under the "substantial evidence" standard.[12] Factual findings will be upheld so long as there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[13]

In questions of law involving the agency's expertise, a rational basis standard will be applied and we will defer to the agency's determination so long as it is reasonable.[14] The rational basis standard is applied where the agency's expertise is involved or where the agency has made a fundamental policy decision.[15]

We will substitute our own judgment for questions of law that do not involve agency expertise.[16] In such cases we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[17]

## IV. DISCUSSION

### A. DeShong Produced Clear and Convincing Evidence that She Was Not Medically Stable During the Time in Dispute.

The Alaska Workers' Compensation Act awards TTD benefits to those workers

11. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 94 (Alaska 2000); *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

12. *Id.*

13. *Grove v. Alaska Constr. & Erectors*, 948 P.2d 454, 456 (Alaska 1997) (quoting *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1046 (Alaska 1978)).

14. *Tesoro Alaska Petroleum Co.*, 746 P.2d at 903.

15. *Id.*

16. *Id.*

17. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

who have not reached medical stability pursuant to AS 23.30.185.[18] Medical stability is reached at

> the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care or the possibility of improvement or deterioration resulting from the passage of time; medical stability shall be presumed in the absence of objectively measurable improvement for a period of 45 days; this presumption may be rebutted by clear and convincing evidence. . . . [19]

Alyeska argues that no physician expected that DeShong would experience objectively measurable improvement in her condition during the time in dispute, and hence she had reached medical stability. Although Dr. Dingeman originally indicated that surgery was a possibility, Alyeska asserts that subsequent indications prevented him from recommending surgery around August 1998, four months before the benefit period in dispute.

The board found that Dr. Dingeman considered DeShong's condition to be medically stable under AS 23.30.395(21). DeShong was therefore required to show clear and convincing evidence that she was not medically stable.[20] But the board also found that Dr. Dingeman recommended evaluation by a specialist and that DeShong was reluctant to undergo surgery until she received Dr. Becker's recommendation. Because DeShong therefore had a legitimate reason for delay, and because the surgery was ultimately successful, the board concluded that clear and convincing evidence showed that DeShong was not medically stable before the surgery and therefore was entitled to TTD benefits.

As noted above,[21] Dr. Dingeman consistently suggested surgery as an option or recommended that DeShong obtain a second opinion. He suggested surgery for the first time in January 1998, and suggested a second opinion for the first time in August of that year. Then, in four other reports dating from September 1998 to May 1999, Dr. Dingeman either mentioned surgery as an option or suggested that DeShong obtain a second opinion from an orthopedist. Under these circumstances, there was substantial evidence to support the board's finding that she had produced clear and convincing evidence that she was not medically stable.

## B. The Board Did Not Assign to Alyeska the Responsibility of Managing DeShong's Medical Care.

The Act allows an employee to designate his or her treating physician.[22] An employee may change physicians once without the written consent of the employer.[23] Referral to a specialist is not considered a change in physicians.[24] An employer can require an employee to see a physician of the employer's choice as well, with this visit being separate from an employee's right to choose his or her physician.[25] An employee can also be referred to

---

18. AS 23.30.185 states:

> In case of disability total in character but temporary in quality, 80 percent of the injured employee's spendable weekly wages shall be paid to the employee during the continuance of the disability. Temporary total disability benefits may not be paid for any period of disability occurring after the date of medical stability.

19. AS 23.30.395(21).

20. *Id.*

21. *See supra* Part II.A.

22. AS 23.30.095(a) provides, in relevant part:

> When medical care is required, the injured employee may designate a licensed physician to provide all medical and related benefits. The employee may not make more than one

change in the employee's choice of attending physician without the written consent of the employer. Referral to a specialist by the employee's attending physician is not considered a change in physicians.

23. *Id.*

24. *Id.*

25. AS 23.30.095(e) provides, in relevant part:

> The employee shall, after an injury, at reasonable times during the continuance of the disability, if requested by the employer or when ordered by the board, submit to an examination by a physician or surgeon of the employer's choice authorized to practice medicine under the laws of the jurisdiction in which the physician resides, furnished and paid for by the employer.

a specialist or change physicians.[26]

Alyeska argues that the board incorrectly held Alyeska responsible for managing DeShong's medical care. Any delay in DeShong's referral to a second physician, Alyeska contends, is the result of Dr. Dingeman's misreading of the workers' compensation statute. Therefore, Alyeska argues, it should not be held responsible for the delay in DeShong's surgery.

But the board's decision does not hold Alyeska responsible for the delay in DeShong's surgery; it merely noted that the combination of the employer's delay in providing an evaluation for the surgery and the final outcome of the surgery produced clear and convincing evidence of no medical stability. And Alyeska was aware of DeShong and Dr. Dingeman's confusion over DeShong's rights under the Act, because copies of Dr. Dingeman's reports were sent to Alyeska. Alyeska, therefore, had notice of the confusion over whether or not DeShong was a surgical candidate; it was also aware of Dr. Dingeman's desire for a second opinion by a specialist.

The board's decision does not have the effect of making Alyeska responsible for managing DeShong's health care. But it does recognize DeShong's understandable confusion concerning the scope of her rights. And the superior court properly emphasized the traditional reluctance of courts to find that a worker has waived procedural rights to seek compensation unless the worker is clearly informed of those rights. As the superior court summarized the situation:

> In construing the applicable workers' compensation statutes, the Board must be guided by the admonition of the courts over the last 40 years that it has a duty to fully advise injured workers. Alyeska agrees that Dr. Dingeman did not appear to understand the applicable law, and it is apparent that Ms. Deshong didn't either. All of the reports were copied to the Board contemporaneously. In October and November of 1998, Dr. Dingeman was still mentioning surgery, while also saying Ms. Deshong didn't want it, and in January of

1999 he said she had not reached "clinical stability." He specifically said "she asked about an additional opinion." In May they were still talking in the same vein, and in July Dr. Dingeman noted that there had been "no additional inquiries from the carrier." Under these circumstances, based on the entire record, a reasonable mind could accept that Ms. Deshong had not during these months reached statutory stability, and that her surgery was delayed due to her ignorance of her right to a timely referral.

Given DeShong's confusion and our unwillingness to find that a worker has waived procedural rights to seek compensation unless the worker is clearly informed of those rights, we agree with the superior court's resolution of this issue.

**C. The Board Did Not Err in Awarding TTD Benefits to DeShong for a Period of Time in Which She Was Receiving Unemployment Benefits on Condition that She Repay the Unemployment Benefits.**

■ Alaska Statute 23.30.187 provides:

Compensation is not payable to an employee under AS 23.30.180 [compensation for permanent total disability] or 23.30.185 [compensation for temporary total disability] for a week in which the employee receives unemployment benefits.

Alyeska argues that the board erred as a matter of law under this statute in awarding TTD benefits to DeShong for a period of time in which she had already received unemployment benefits. The board found that the entire record showed that DeShong clearly disclosed her light duty limitations in her application for unemployment. Because she was unable to find work under these restrictions, the board concluded that her injury precluded her from a job in the "real market." The board awarded her TTD benefits for the claimed period "provided she repays the [unemployment insurance] benefits received as required by [ ] AS 23.30.187."

■ In upholding the board's decision, the superior court found the board's interpreta-

**26.** *Id.*

tion of AS 23.30.187 to be within the board's area of expertise and applied the deferential rational basis standard of review. But the statute does not involve any interpretation or question of law relating specifically to workers' compensation. Where the question presented does not involve agency expertise, the substitution of judgment standard is used.[27] This "standard is appropriate where the knowledge and experience of the agency is of little guidance to the court or where the case concerns ' "statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge." ' " [28] Accordingly, we use our own judgment in reviewing the board's decision.

We have not previously faced the issue now before us.[29] We must interpret AS 23.30.187 to determine if it presents an absolute bar to receipt of TTD benefits by an injured worker who has already received unemployment benefits.

■ In interpreting a statute, we consider its language, its purpose, and its legislative history, in an attempt to "give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others." [30] As we have explained, "[i]n order to interpret a statute contrary to its plain meaning, ' "the plainer the language, the more convincing contrary legislative history must be." ' " [31]

Alaska Statute 23.30.187 clearly precludes the contemporaneous receipt of temporary or permanent total disability benefits and unemployment benefits.[32] Yet on its face, the statute says nothing about whether an employee who has received unemployment benefits for a week during which she was eligible for, but did not receive, workers' compensation benefits, may repay the former in order to qualify for the latter.[33] Because of this inherent ambiguity, we turn to the purpose of the statute and its accompanying legislative history for indications of whether the legislature intended that such action be prohibited.

The purpose of the workers' compensation system is to "compensate the victims of work-related injury for a part of their economic loss." [34] Under this system, each employer is required to have workers' compensation insurance to cover its potential compensation costs,[35] resulting in the employer and the consumers of its goods bearing much of the financial cost of the system. As we explained in *Wright v. Action Vending Co.*,[36]

[t]he ultimate social philosophy behind compensation liability is belief in the wisdom of providing, in the most efficient, most dignified, and most certain form, financial and medical benefits for the victims of work-connected injuries which an enlightened community would feel obligated to provide in any case in some less satisfactory form, and of allocating the burden of these payments to the most appropriate

27. *Madison v. State, Dep't of Fish & Game*, 696 P.2d 168, 173 (Alaska 1985).

28. *Id.* (quoting *Earth Res. Co. v. State, Dep't of Revenue*, 665 P.2d 960, 965 (Alaska 1983) (quoting *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971))).

29. Indeed, we have cited AS 23.30.187 only twice, and neither case involved the question before us today. *See Wien Air Alaska v. Kramer*, 807 P.2d 471, 473 n. 3 (Alaska 1991) (noting that AS 23.30.187 prohibits a recipient of unemployment benefits from simultaneously collecting disability compensation); *Alaska Pacific Assurance Co. v. Brown*, 687 P.2d 264, 272 n. 13 (Alaska 1984) (observing that one of the purposes served by AS 23.30.187 is to maintain benefits at a level which does not discourage the recipient from returning to work).

30. *Muller v. BP Exploration (Alaska) Inc.*, 923 P.2d 783, 787 (Alaska 1996).

31. *Alderman v. Iditarod Props., Inc.*, 32 P.3d 373, 393 (Alaska 2001) (quoting *State v. Alex*, 646 P.2d 203, 208–09 n. 4 (quoting *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir. 1973))).

32. AS 23.30.187.

33. *Id.*

34. *Wien Air Alaska v. Arant*, 592 P.2d 352, 357 (Alaska 1979) *overruled on other grounds by Fairbanks N. Star Borough Sch. Dist. v. Crider*, 736 P.2d 770, 775 (Alaska 1987).

35. AS 23.30.075(a).

36. 544 P.2d 82 (Alaska 1975).

source of payment, the consumer of the product.[37]

Turning to the legislative history, there is no indication that the legislature sought to render ineligible for workers' compensation benefits an employee who has previously collected unemployment insurance. Instead, what it does reveal are concerns regarding double recovery, the receipt of workers' compensation benefits by employees who have already reached medical stability, and the disincentive to return to work created by overpayment to injured workers.

At the beginning of the Twelfth Legislature's second session, Representative Terry Martin, Chair of the House Labor and Commerce Committee, circulated an open letter regarding House Bill 159 (H.B.159) to "[a]ll concerned about Alaska's Workers Compensation." [38] In the letter, Representative Martin explained:

> Changes have taken place in our state which now result in a number of claimants drawing *excessively large benefit amounts* or drawing benefits *when they should not be entitled to them at all.* An effort should be made to seek alternatives that would eliminate oversized, unearned benefits while still protecting the vast majority of the workforce.[39]

Representative Martin recognized the possibility of overlap between workers' compensation and unemployment insurance benefits received by partially disabled workers who, while unable to perform their previous jobs, were still eligible to work, and proposed that they receive a dollar-for-dollar offset.[40] This proposal was not adopted, leaving open the possibility that a partially disabled worker could simultaneously receive both unemployment and workers' compensation benefits.

The concerns of Alaska's businesses were reflected in a report prepared by the Alaska Conference of Employers, Inc. (ACE) entitled "Recommended Changes to the Alaskan Workers' Compensation Act." [41] One of the suggestions made in this report pertained to employees receiving or eligible to receive both unemployment and workers' compensation benefits.[42] Concerned about overcompensating injured employees, ACE explained:

> The Workers' Compensation Act has been called upon throughout the years to compensate employees *after they reach the date of maximum medical improvement* and before that point in time when employment opportunities improve and jobs become available. The practice is based upon the theory that a compensable injury caused a loss of the job, and therefore the unemployment is the result of the industrial injury and workers' compensation is proper until a new job is available.[43]

Believing that the workers' compensation system should not bear the burden of supporting employees whose physical conditions are not expected to improve, ACE proposed that the primary benefit in such situations be unemployment insurance, and that workers' compensation, if available at all, should be

---

**37.** *Id.* at 86–87 (quoting 1 Arthur Larson, Workmen's Compensation Law § 2.20 (1972), now Arthur Larson & Lex Larson, Larson's Workers' Compensation Law § 1.03[2] at 1–5 (May 2003)).

**38.** Letter from Representative Terry Martin, Chairman House Labor & Commerce Comm., Alaska State Legislature, to All Concerned About Alaska's Workers Compensation, Referencing More Points of View to Consider for Alaska's Workers Compensation Legislation, H.B. 159, 1981 (January 5, 1982) (House Labor & Commerce Comm. File, H.B. 159 (1981–82)).

**39.** *Id.* at 1 (emphasis added).

**40.** In his letter, Representative Martin explained: "Normally an individual receiving workers compensation for any week would not be able to

work, and therefore would not qualify for unemployment compensation. There are situations, however, where the person could be able to work but cannot perform his old job because of the disability. If he is receiving unemployment compensation for any such week, the worker compensation should reduce dollar for dollar any unemployment benefit the individual could otherwise receive." *Id.* at 2.

**41.** Edward L. Hite, Recommended Changes to the Alaskan Workers' Compensation Act, Prepared for the Alaska Conference of Employers, Inc (1982) (House Labor & Commerce Comm. File, H.B. 159 (1981–1982)).

**42.** *Id.* at 74–75.

**43.** *Id.* at 74 (emphasis added).

used only as a supplement.[44] ACE's version of the statute provided in relevant part:

(a) No compensation shall be payable for *temporary total disability or permanent total disability* under this chapter for any week in which the injured employee has received, or is receiving, or is eligible for unemployment compensation benefits.

(b) If an employee is entitled to both compensation for wage-loss pursuant to AS 23.30.190(b) and unemployment compensation benefits, *such unemployment compensation benefits shall be primary and the compensation for wage-loss shall be supplemental only,* the sum of the two benefits not to exceed the amount of wage-loss compensation which would otherwise be payable.[45]

ACE's version, which specifically addressed which system would bear the burden of compensating dually-eligible employees, was not adopted by the legislature.

Ultimately, the legislature settled on the language substantially similar to that currently used in section 187, which does not prefer unemployment insurance to workers' compensation, does not provide for an offset, and does not discuss permanent or temporary partial disability. The final version provided:

Sec. 23.30.227. OTHER BENEFITS. No compensation shall be payable to an employee under §§ 180 [permanent total disability] or 185 [temporary total disabili-

ty] of this chapter for any week in which the employee receives unemployment benefits (AS 23.20).[46]

In response to the final version of section 227, the committee heard a position statement from Dick Block, then-president of the Alaska National Insurance Company,[47] who expressed concern that "an employee would reject unemployment insurance and take workers compensation."[48] Rejecting the idea that the statute permitted a totally disabled employee to select among potential remedies, Representative Rogers explained that "this section applies only to total disability, and one who is totally disabled cannot draw unemployment."[49]

In the analysis of the final bill prepared for the Senate Labor and Commerce Committee, current section AS 23.30.187 was explained as follows:

This section clarifies the relationship between workers' compensation and unemployment benefits. Temporary total and permanent total disability compensation are *not consistent* with the eligibility of an injured worker to receive unemployment benefits, and accordingly, are not payable to an injured worker receiving unemployment benefits. This section does not affect the payment of temporary partial or permanent partial disability compensation to a worker who is receiving unemployment benefits.[50]

44. *Id.*

45. *Id.* at 74–75 (emphasis added).

46. Committee Substitute for House Bill (C.S.H.B.) 159, 12th Leg., 2d Sess. (1982).

47. The Alaska National Insurance Company performs policy issue and loss adjusting services for the Alaska Assigned Risk Pool, which was established by the State of Alaska for those employers unable to find an insurance company to write workers' compensation insurance on a voluntary basis. *See* Alaska National Insurance Company website, http://www.alaskanational.com/index.php?action=akworkers (last visited Aug. 14, 2003).

48. *See* House Labor & Commerce Standing Comm. Meeting Minutes, H.B. 159, Tape No. 19, No. 103 (House Labor & Commerce Comm. File, H.B. 159 (Feb 18, 1982)).

49. *Id.* In order to collect unemployment insurance, an individual must be "able to work and available for suitable work." AS 23.20.378(a). Because one who is totally disabled for the purposes of workers' compensation is temporarily unable to work, she cannot be legally eligible for both. *See Bailey v. Litwin Corp.*, 713 P.2d 249, 253 (Alaska 1986) (endorsing territorial court's definition of temporary total disability in *Phillips Petroleum Co. v. Alaska Indus. Bd.*, 17 Alaska 658, 665 (D.Alaska 1958) (quoting *Gorman v. Atl. Gulf & Pac. Co.*, 178 Md. 71, 12 A.2d 525, 529 (1940)) as " 'the time during which the workman is wholly disabled and unable by reason of his injury to work' ").

50. SECTION BY SECTION ANALYSIS, C.S. FOR HOUSE BILL No. 159 § 19 (Senate Labor & Commerce Comm. File, H.B. 159 (1981–82)) (emphasis added).

Nowhere in the legislative record is there any indication that the legislature intended receipt of unemployment benefits to permanently bar an injured employee from receiving workers' compensation benefits when appropriate. Instead, the legislative history indicates that the legislature was aware of the potential for overlap between unemployment and workers' compensation benefits and sought to prevent a double recovery by claimants. It certainly does not appear that the legislature envisioned the situation currently before this court, where a temporarily injured worker receives misinformation from her physician with the knowledge of her employer, is released to work with restrictions that effectively bar her from finding employment, is laid off by that employer, prompting her to apply for unemployment benefits, and then finally receives a second opinion, after which she undergoes surgery, displays signs of recovery, and then retroactively applies for temporary total disability benefits.

The dissent concludes that the statute is completely unambiguous, effectively arguing that the statute admits only one interpretation: that an employee is forever barred from receiving workers' compensation benefits for any week in which the employee has ever received unemployment compensation. But the statute does not say that; it says that the compensation is not payable "for a week in which the employee receives unemployment benefits." The board's interpretation of the statute—that a week for which the employee has repaid benefits is not a week "in which the employee receives unemployment benefits"—is consistent with the language of the statute. Moreover, under the

facts of this case, the board's interpretation leads to the result the workers' compensation system was created to provide: the award of compensation benefits to which the injured worker was entitled.

The Workers' Compensation Board concluded that DeShong had demonstrated by clear and convincing evidence that she had never been medically stable and therefore had been eligible for temporary total disability benefits since December 1998. The superior court concluded that there was substantial evidence to support that finding and we agree. Because we can discern no language, either in the statute itself or in the legislative history, that erects a permanent bar to the receipt of workers' compensation benefits if unemployment benefits have been repaid, we affirm the holding of the board. To hold otherwise would forever bar an unknowing and injured employee from receiving the workers' compensation benefits to which she is otherwise entitled merely because she first applied for unemployment insurance. The language of the statute does not require this result, nor do we believe such an outcome would be desirable. Given the discernable purposes of the legislature in enacting AS 23.30.187—preventing double recovery, denying workers' compensation coverage for workers who have reached maximum medical stability, and maintaining incentives to return to work—requiring DeShong to repay her unemployment benefits before she is entitled to receive TTD benefits was an appropriate response to her situation.[51] We therefore affirm the board's decision.

**51.** We recognize that other states have taken varying approaches to the situation presented by this case: some allow for offset through the workers' compensation system for employees who have already collected unemployment insurance, see, e.g., Brooks v. Chrysler Corp., 405 A.2d 141, 143 (Del.Super.1979) (holding that receipt of unemployment does not necessarily disqualify one from receiving disability benefits but that any disability award should be reduced by the amount of unemployment benefits received); some statutorily provide for offset in their workers' compensation statutes, see, e.g., Colo.Rev. Stat. Ann. § 8–42–103(1)(f) (West, WESTLAW through 2003 Sess.) (allowing an offset of TTD by any unemployment benefits received); and some hold that prior receipt of unemployment benefits does not bar receipt of workers' compensation benefits. See J.E. Leonarz, Annotation, *Application for, or Receipt of, Unemployment Compensation Benefits as Affecting Claim for Workmen's Compensation,* 96 A.L.R.2d 941, § 3 (1964). While using workers' compensation to offset DeShong's receipt of unemployment insurance might have been a viable option in this case, neither party advocated for such a result. Rather, DeShong sought an order for reimbursement and Alyeska argued that no award was appropriate. Because offset has not been sought by either party, and because we have received no briefing on the issue, we reserve for future decision the question of whether offset might ordinarily provide a remedy preferable to reimbursement.

## V. CONCLUSION

Because the board did not err in concluding that DeShong produced clear and convincing evidence that she was not medically stable during the time in dispute and did not err in requiring DeShong to repay her unemployment benefits before she could receive TTD benefits, we AFFIRM the superior court's decision that affirmed the decision of the board.

EASTAUGH, Justice, with whom MATTHEWS, Justice, joins, dissenting in part.

### A. Introduction

This appeal turns in part on the interplay between the Alaska Employment Security Act, AS 23.20, and the Alaska Workers' Compensation Act, AS 23.30. Both protect workers against wage loss. A worker recovering under both schemes is potentially overcompensated. The statute that controls this case, AS 23.30.187, avoids overcompensation by prohibiting workers from receiving total disability workers' compensation benefits for weeks for which they received unemployment compensation. This method of avoiding overcompensation reflects a legislative policy choice. The method the court chooses here—allowing the worker to repay unemployment compensation benefits to regain eligibility for workers' compensation benefits— also avoids overcompensation. But the clear words of the statute preclude that choice. The legislative history does not permit us to read the statute to say something it does not; rather, it conflicts with the court's interpretation of section .187. Because it is impossible to square the result reached here with the statute's words, I respectfully dissent from that part of the opinion permitting the worker to recover workers' compensation benefits for weeks when she received unemployment compensation.

1. Op. at 1233–1234, 1237.

2. Op. at 1238.

3. *See Nickels v. Napolilli*, 29 P.3d 242, 247 (Alaska 2001) (explaining that the Workers' Compensation Act is a mutual arrangement of reciprocal rights between employer and employee, whereby both parties give up and gain certain advantages;

### B. Background Facts

Mabel DeShong suffered an employment-related injury in 1997 while employed by Alyeska Pipeline Service Co. She continued to perform light-duty work for Alyeska until December 2, 1998, when she was laid off. Invoking the Alaska Employment Security Act (AESA) after she was laid off, she sought and received unemployment compensation for 1999. Invoking the Alaska Workers' Compensation Act (AWCA), she also sought temporary total disability (TTD) benefits for the period between December 27, 1998 to September 15, 1999 (when she had successful surgery). The Alaska Workers' Compensation Board, rejecting the employer's argument to the contrary, concluded that DeShong was eligible to receive workers' compensation for that eight-and-a-half month period, even though she had already received unemployment compensation for the same period, "provided she repays the [unemployment benefits] received as required by AS 23.30.180." The superior court affirmed, observing that the board's interpretation of the statute "is within its expertise."

### C. The Result the Court Reaches

Applying, as it must, the nondeferential standard of its own judgment to the statutory interpretation issue presented here, this court affirms the superior court and the board.[1] It reasons that requiring DeShong to repay her unemployment benefits before she is "entitled" to receive TTD benefits was an "appropriate response to her situation."[2]

### D. The Result We Should Reach

Workers' compensation is purely a creature of statute.[3] There is no common law right to it.[4] Our sole responsibility here is to determine what AS 23.30.187 means. No

in exchange for guaranteed recovery for post-injury wage loss and medical expenses, employees give up opportunity to seek full scope of tort or negligence damages); AS 23.30.

4. *Nickels,* 29 P.3d at 248 ("[T]he remedies offered by the workers' compensation statute supercede any common law remedies outside of the statutory scheme.").

other provision in the AWCA or the AESA addresses the issue presented.

In interpreting a statute we have rejected a mechanical application of "the plain meaning" rule in favor of a sliding scale approach. " 'The plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' The language of a statute is 'construed in accordance with [its] common usage,' unless the word or phrase in question has 'acquired a peculiar meaning by virtue of statutory definition or judicial construction.' " [5] "In ascertaining the plain meaning of a statute, we refrain from adding terms." [6] We have observed that legislative history "may provide an insight which is helpful in making a judgment concerning what a statute means, and since words are necessarily inexact and ambiguity is a relative concept." [7]

Section .187 is conceptually simple. Its words are simple, clear, and unambiguous. It states that "Compensation is not payable to an employee under AS 23.30.180 or 23.30.185 for a week in which the employee *receives* unemployment benefits." (Emphasis added.) It thus renders a worker who received unemployment compensation ineligible to receive workers' compensation for total disability for the same period.[8] DeShong "received" unemployment compensation for the same weeks for which she seeks TTD benefits. To "receive" is commonly defined as to "acquire or take (something given, offered, or transmitted)." [9] Whether or not DeShong repays her unemployment benefits, she "received" them as that word is used in section .187. Section .187 therefore prevents her from recovering TTD benefits for those weeks.

The meaning of section .187 is confirmed by AS 01.10.050(a), which dictates how we are to read the Alaska Statutes. It provides in pertinent part: "Words in the present tense include the past and future tenses. . . ." This provision requires us to interpret "receives" to include "received" and precludes us from distinguishing between "receives" and "received" when we apply AS 23.30.187.

The extraordinary clarity of the words of section .187 would allow us to deviate from its text only if the legislative history were extremely convincing. Its words are so clear, it is hard to imagine any legislative history that could contradict them.[10] But as we will see, the legislative history confirms the words' plain meaning. It certainly does not permit the result the court's opinion reaches.

## E. The Problem of Overlapping Benefits

The preeminent workers' compensation treatise has addressed the possibility of cumulative wage loss benefits. Larson's treatise recognizes that duplication of benefits from different parts of the system of protecting workers against wage loss should

---

**5.** *Municipality of Anchorage v. Suzuki,* 41 P.3d 147, 150–51 (Alaska 2002) (quoting *Muller v. BP Exploration (Alaska) Inc.,* 923 P.2d 783, 788 (Alaska 1996) (footnotes omitted)).

**6.** *Id.* (citing *Hickel v. Cowper,* 874 P.2d 922, 927–28 (Alaska 1994) ("Our analysis of a constitutional provision begins with, and remains grounded in, the words of the provision itself. We are not vested with the authority to add missing terms or hypothesize differently worded provisions in order to reach a particular result.")).

**7.** *Bullock v. State, Dep't of Cmty. & Reg'l Affairs,* 19 P.3d 1209, 1214 (Alaska 2001) (quoting *State, Dep't of Natural Res. v. City of Haines,* 627 P.2d 1047, 1049 n. 6 (Alaska 1981)).

**8.** The two statutes cited in section .187 both deal with total, not partial, disability claims. AS 23.30.180 provides for awards of permanent total disability. AS 23.30.185 governs awards of tem-

porary total disability, the sort of claim DeShong made here. Section .187's prohibition therefore applies only to applicants for total disability benefits.

**9.** WEBSTER's II NEW COLLEGE DICTIONARY 924 (1995).

**10.** *See Enders v. Parker,* 66 P.3d 11, 14 (Alaska 2003) ("Where a statute's meaning appears clear and unambiguous, ... the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent." (quoting *Univ. of Alaska v. Tumeo,* 933 P.2d 1147, 1152 (Alaska 1997))). *See also Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1065 (Alaska 2002) ("When interpreting the language of a statute, we normally give unambiguous language its plain meaning. We may also rely on legislative history as a guide to interpretation, but the plainer the language of a statute, the more convincing contrary legislative history must be to interpret a statute in a contrary manner.") (citations and quotations omitted).

not ordinarily be allowed.[11] The treatise recognizes that in reality, a worker experiences only one wage loss and "in any logical system" should receive only one wage-loss benefit.[12] Larson observes that some jurisdictions have "permitted collection of both unemployment and workers' compensation benefits for the same period, in the absence of any statutory prohibition."[13] The treatise notes, however, that "[t]he majority of unemployment statutes ... now specifically forbid benefits to anyone drawing workers' compensation."[14] The treatise cites AS 23.30.187 as an example of one such statutory provision.[15] Larson summarizes acts from other states and observes that state statutes vary considerably, some restricting eligibility under the unemployment compensation acts and some restricting eligibility under the workers' compensation acts.[16] Larson observes that "a few compensation acts have recently added an offset for unemployment insurance benefits," and describes how some courts have struggled to coordinate inconsistent statutory systems.[17]

Before 1982, the legislature offered no clear guidance for how to resolve this potential problem in Alaska. There were possible implicit inconsistencies in seeking both remedies. A worker is entitled to unemployment compensation benefits if the worker is "able to work,"[18] and a disabled worker is not necessarily "able to work." Conversely, a worker who is "able to work" is not obviously "disabled," and is therefore not obviously eligible for workers' compensation benefits.[19] It is at least arguable that applying for unemployment compensation benefits would be inconsistent with applying for temporary total disability benefits, whether or not the employee, as DeShong did here, indicated that she could only work at light duty tasks.

If the two applications are inherently inconsistent, the worker has arguably misrepresented either her ability to work or her disability. Making a misrepresentation or false statement potentially disqualifies a worker from unemployment compensation.[20] A person making a false statement or representation to obtain workers' compensation benefits may be required to repay them.[21]

Yet a worker who is only partially disabled may be able to return to work in some capacity. So in theory, a partially disabled employee who has been laid off "is able to work" in some capacity, and is thereby eligible for both unemployment compensation benefits under AS 23.20, and temporary partial disability or permanent partial disability workers' compensation benefits under AS 23.30.190 or AS 23.30.200. This theoretical dual eligibility is more problematic for a worker who, like DeShong, claims to be totally disabled for workers' compensation purposes.

In 1982 the legislature addressed this problem by enacting AS 23.30.187. The concept behind section .187 is simple. It does only one thing: it precludes an otherwise eligible workers' compensation claimant from receiving temporary total or permanent total disability workers' compensation benefits for a week in which unemployment compensation benefits were *received*. It thus withdraws eligibility for workers' compensation benefits for those weeks. It does so unconditionally. It contains no words describing or implying a procedure for restoring a claimant's eligibility to recover workers' compensation benefits for those weeks. It contains no words offering an interpretative finger hold for finding such a procedure.

---

11. Arthur Larson & Lex Larson, Larson's Workers' Compensation Law § 97.00 (1999).

12. *Id.* § 97.10, at 18–9, 18–11.

13. *Id.* § 97.20, at 18–12.

14. *Id.*

15. *Id.*

16. *Id.* at 18–12 n. 13.1.

17. *Id.* at 18–12 to 18–21; *see also* app. B–18A (offset provisions in state workers' compensation laws).

18. AS 23.20.378(a).

19. AS 23.30.180, .185, .190, .200.

20. AS 23.20.387.

21. AS 23.30.250(b).

There are many other possible ways to avoid overcompensation. For example, one way might make one scheme or the other the exclusive remedy. Another might permit an offset, reducing workers' compensation benefits by unemployment compensation received for the same period. Another might require pro rata apportionment of benefits under both schemes. And another might require the employee to repay the unemployment compensation benefits before receiving workers' compensation benefits for the same period. Each way allocates burdens and benefits differently. Some favor the worker; some favor the employer who purchases workers' compensation insurance; and some favor the state's employment security fund (which is in turn funded by employer contributions). Legislatures are best suited for making such choices, because they can decide how best to balance all the interests involved. Courts are ill-suited for choosing among so many possibilities. We have been provided with none of the facts bearing on which way is socially superior, which is the most efficient way to protect workers against wage loss, who best can bear that loss, and how best to apportion the loss if it is to be shared.[22]

No doubt the legislature could have rationally chosen the method adopted by the board and this court (placing the entire loss on the workers' compensation insurer for the duplicate weeks and reimbursing the unemployment compensation fund). But the legislature did not choose that method. It enacted a statute that treats the receipt of unemployment compensation benefits as an event that disqualifies the worker from receiving workers' compensation benefits.

These policy choices are for the legislature. Our job here is to determine what choice the legislature made. Because its choice is clear, we must adhere to it.

## F. Legislative History

The legislative history does not contradict the statute's text and provides no support for rewriting its words. Instead, it suggests that the legislature was aware of other possible ways to avoid overcompensation and nonetheless adopted the simple ineligibility scheme described in section .187.

House Bill 159, introduced in 1981 at the first session of the Twelfth Legislature, was proposed in part because some employers were concerned that injured workers were receiving workers' compensation after they reached medical stability; the employers thought that the primary benefit should be unemployment compensation.[23] The employers proposed that workers' compensation, if still payable, was to be supplemental to the unemployment compensation benefits.[24] This proposal contained two provisions, one which was equivalent to section .187 as it now exists, and a second which contemplated eligibility for both unemployment and workers' compensation benefits, in which event the unemployment compensation benefits were to be primary and the workers' compensation benefits were to be only supplemental.[25] The origins of section .187 do not support an interpretation—such as the court's—that makes workers' compensation the primary wage-loss benefit.

A Senate Labor and Commerce Committee section-by-section analysis of the bill noted that the provision that became section .187 clarified the relationship between workers' compensation and unemployment benefits.

Temporary total and permanent total disability compensation are not consistent with the eligibility of an injured worker to receive unemployment benefits, and accordingly, are not payable to a injured worker receiving unemployment benefits. This section does not affect the payment of

---

22. In addressing the various policy considerations raised by the problem of overlapping benefits, Larson's treatise notes that "the optimum solution is to have this coordination achieved by the legislature, since detailed questions are certain to arise that can only be handled by carefully considered legislation." LARSON & LARSON, *supra* note 11 § 97.20, at 18–18.

23. House Bill (H.B.) 159, 12th Leg., 1st Sess. (Feb. 13, 1981); EDWARD L. HITE, RECOMMENDED CHANGES TO THE ALASKAN WORKERS' COMPENSATION ACT, PREPARED FOR THE ALASKA CONFERENCE OF EMPLOYERS, INC. (1982) (House Labor & Commerce Comm. File, H.B. 159 (1981–82)).

24. HITE, *supra* note 23.

25. *Id.*

temporary partial or permanent partial disability compensation to a worker who is receiving unemployment benefits.[26]

This analysis confirms that the legislature considered total disability workers' compensation benefits to be "not consistent" with eligibility for unemployment benefits, and chose to resolve this inconsistency by making them "not payable" to workers "receiving" unemployment benefits. It also notes that the bill preserved the eligibility of workers who seek only partial disability benefits. DeShong sought total disability benefits, not partial disability workers' compensation benefits.

The history also reveals that legislators were aware of other possible ways of avoiding an overlap. During consideration of HB 159, Representative Terry Martin circulated a memorandum discussing several issues and referring specifically to unemployment compensation.[27] He noted that there were situations in which a person could be able to work but could not perform "his old job because of the disability." He proposed this result: "If he is receiving unemployment compensation for any such week, the worker compensation should reduce dollar for dollar any unemployment benefit the individual could otherwise receive."[28] Representative Martin thus proposed a dollar-for-dollar reduction, what this court seems to characterize as an "offset."[29] But the statute as enacted says nothing of such a reduction.

Although the legislature was aware of other ways to address the issue of overlapping benefits, it enacted the flat prohibition expressed in section .187. There is no possibility that in doing so it thought that it was allowing an employee to repay unemployment compensation benefits to regain eligibility for workers' compensation benefits, or that it was making workers' compensation

the primary wage-loss remedy. Because employer cost was a motivating factor in adopting section .187, it seems unlikely the legislature wished to adopt a means of preventing double recovery that was apparently the most costly way (for employers) of resolving the problem.

In short, the legislative history reveals nothing ambiguous about section .187. It confirms that the legislature made a policy choice that is inconsistent with the court's interpretation of the statute.

### G. Problems with the Court's Rationale

The court permits DeShong to recover TTD benefits even though the statute does not.

In affirming, the court approves the procedure adopted by the board: "Because the board ... did not err in requiring DeShong to repay her unemployment benefits ..., we AFFIRM."[30] But the board based that result on the board's fundamental misreading of section .187. Thus, the board concluded that DeShong was eligible for TTD benefits for the disputed period, "provided she *repays* the [unemployment] benefits received *as required by AS 23.30.187.*" (Emphasis added.) If the statute had contained such a requirement, it would have implied the remedy the board fashioned. But nothing in section .187 "requires" repayment of other benefits. The linchpin of the board's remedy does not exist. Indeed, the statute says nothing about repayment. And it says nothing about regaining eligibility for workers' compensation. Because the statute makes receipt of unemployment benefits the disqualifying event, and because repayment does not negate the fact of past receipt, the statute's words expressly and implicitly foreclose the board's notion that repayment restores eligibility.

**26.** SECTION BY SECTION ANALYSIS, C.S. FOR HOUSE BILL No 159 (Senate Labor & Commerce Comm. File, H.B. 159 (1981–82)); *see also* Comm. Substitute for House Bill (C.S.H.B.) 159, 12th Leg., 2d Sess. (1982).

**27.** Letter from Representative Terry Martin, Chairman House Labor and Commerce Committee, Alaska State Legislature, to All Concerned About Alaska's Worker's Compensation, Refer-

encing More Points of View to Consider for Alaska's Worker's Compensation Legislation, H.B. 159, 1981 (January 5, 1982) (House Labor & Commerce Comm. File, H.B. 159 (1981–82)).

**28.** *Id.*

**29.** Op. at 1235–1236.

**30.** Op. at 1237–1238.

This court's opinion also seems to rest on a similar misapprehension. It reasons that repayment enabled DeShong to receive the workers' compensation benefits "she was entitled to."[31] But per section .187, for the weeks for which DeShong received unemployment compensation, she is "entitled to" no workers' compensation benefits.

The court's opinion also implicitly reads the statute to make *retention* of unemployment compensation the disqualifying event. If it were, repayment might be a fair way to avoid the statutory bar. But the statute's words make *receipt,* not *retention,* the disqualifying event.[32] Ineligibility does not arise exclusively out of present receipt of benefits; per the plain language of section .187 and AS 01.10.050(a), past receipt is also a disqualifier. DeShong received unemployment benefits in the past; she is consequently ineligible for TTD benefits for those weeks.

The procedure fashioned by the board and endorsed by this court's opinion has the unavoidable effect of adding new words to the statute.[33] By limiting the preclusion, the opinion creates a procedure, not implied or expressed by the legislature in section .187 or anywhere else, by which workers' compensation claimants seeking TTD benefits can restore their eligibility. This procedure gives claimants an option the legislature did not choose to give them. Section .187 does not provide injured workers a choice between benefit systems.

Given the clarity of the statute, the legislative history would have to be remarkably clear to support the court's interpretation of the statute. I do not read the legislative history discussed by the court to imply, much less clearly and unequivocally express, an intention to allow the reading the board and this court attribute to the statute. Moreover, after reviewing the legislative history, the court's opinion observes that "It certainly does not appear that the legislature envisioned the situation currently before this court. . . ."[34] That observation seems to conflict with any contention that the statute is ambiguous because it fails to carry out the legislature's intentions with respect to the present situation, or that the legislature actually intended the statute to provide relief in a "situation" like DeShong's.

At first glance, it may seem to make sense to condition recovery of workers' compensation benefits on repayment of unemployment compensation. But section .187 gives the Alaska Workers' Compensation Board no authority to order a workers' compensation claimant to repay benefits the claimant recovered under AS 23.20. The board does not administer unemployment compensation claims. Its authority is limited to claims under AS 23.30. Had DeShong declined to repay the unemployment benefits, section .187 would have given the board no legal basis for requiring her to do so as a condition for becoming eligible for TTD benefits. Her refusal would have forced the board to decide whether section .187 permits a worker to receive (and retain) overlapping benefits, or whether (as I think) section .187 prohibits recovery of TTD benefits for the same period. A claimant's willingness to repay the unemployment benefits cannot unilaterally alter the meaning of a statute. The legislature elsewhere gave the board authority to order a person improperly obtaining benefits under AS 23.30 to reimburse the cost of all such benefits, but that authority only covers benefits under "this chapter," i.e., workers' compensation benefits.[35] That grant of authority reveals that the legislature knew how to write a statute giving the board authority to require repayment when that was what the legislature intended. Nothing I see in AS 23.30 gives the board general authority to do what it did here. Assuming the board has inherent authority to resolve disputes fairly and in a way that maximizes workers' compensation benefits, that authority would not

---

31. Op. at 1237.

32. Retention would prove unworkable as a disqualifying event under section .187 because the statute does not specify how long one would have to retain unemployment benefits to be disqualified from workers' compensation benefits.

33. *See supra* note 6.

34. Op. at 1236–1237.

35. AS 23.30.250(b).

justify reading section .187 to "require" repayment, or to authorize a procedure for regaining eligibility.

The existence of express remedies in other provisions in these acts militates against the procedure approved here. An AESA section, AS 23.20.390, provides for repayment of unemployment compensation benefits, but only if the worker was not entitled to receive them. Section .390 does not refer to the Alaska Workers' Compensation Act or to receipt of workers' compensation benefits; there is no claim here that DeShong was not eligible for Alaska Employment Security Act benefits when she sought and received unemployment compensation payments. Nor does the AESA disqualify a worker from receiving unemployment compensation benefits if the worker also received workers' compensation benefits. Other provisions in these remedial acts reveal that the legislature knew how to enact statutory provisions calling for reductions in benefits (AS 23.20.362), repayment (AS 23.20.390), offsets (AS 23.30.225), or reimbursement (AS 23.30.155(j)), when it wished to do so.

Implicit in the decisions of the board and this court is the notion that the statute permits a partially disabled worker, like DeShong, to be treated differently from a totally disabled worker. But insofar as this distinction seemingly turns on whether a worker, in applying for unemployment compensation, candidly reveals that she was only partially disabled, it is foreclosed by the words of section .187. They flatly preclude recovery of total disability benefits for the weeks for which an employee received unemployment compensation, without regard to what she said in her unemployment compensation application. This distinction is also factually foreclosed here: DeShong sought temporary *total,* not temporary *partial,* workers' compensation benefits. Section .187 expressly applies to an employee seeking workers' compensation benefits for total disability.

The court relies on the purpose of the legislation, characterizing it as having the purpose of precluding double recovery.[36] Treating that purpose as controlling, the court reads the statute in a way that avoids double recovery, by making DeShong repay the unemployment benefits in order to be eligible to receive TTD benefits. This purpose does not justify misreading the statute. First, this is not the only statutory purpose; the legislative history reveals a variety of motivations; the section-by-section analysis refers to eligibility.[37] Second, the words of the statute are so transparent that they control.[38] Third, having a purpose of avoiding double recovery does not say how it is to be achieved. The method the legislature chose to prevent double recovery—ineligibility—is effective. That other methods arguably might have been equally effective or socially more desirable does not allow us to rewrite the statute.

The court declines to decide whether an offset might have been superior to reimbursement.[39] An offset would be another way to avoid an overlap. An offset would also require both schemes to contribute. On its face, the statute would not permit that result. Of course, it does not permit the result the court reaches, either. Because it declines to consider the offset method, the court simply chooses the repayment method. Each method implicates policy choices best left to the legislature. Permitting a claimant to repay unemployment benefits before receiving TTD benefits means that the full loss is ultimately borne by the workers' compensation system. The choice the court makes today is a policy choice. That there is more than one way to fashion a remedy and that choosing one way necessarily burdens one interest or another confirms that these are choices we should not be making. That is especially so given the complete absence of words in section .187 giving the court any basis for deviating from the choice the legislature made.

---

**36.** Op. at 1236–1237.

**37.** The only legislative intent expressed in the act that included AS 23.30.187 addressed a completely different provision, and said nothing of double recovery. Ch. 93, § 1, SLA 1982.

**38.** *See supra* notes 5–7, 9.

**39.** Op. at 1237 n. 51.

The opinion says that requiring DeShong to repay her unemployment benefits before she is entitled to receive TTD benefits is "an appropriate response" to DeShong's "situation."[40] Likewise, the court assumes the legislature did not envision the "situation" now before us. It then describes DeShong's precise "situation."[41] That the legislature was arguably not omniscient when it enacted section .187 would not give us authority to craft a remedy the legislature did not. But in this case, the words of the statute are broad enough to include DeShong's situation. It does not matter that her situation is only a subset, even one that may be unique and sympathy provoking, of the situations swept up by AS 23.30.187. This circumstance does not make the statute less applicable to her, or justify altering it.

Finally, the opinion today creates a problematic legacy for legislators trying to write statutes and parties and courts trying to apply them. If this statute does not mean what it so clearly says, when will a statute ever be applied as written? What could the legislature have said to make its intentions clearer?

## H. Conclusion

The court reaches a result the statute does not permit. We should reverse and remand to the board with instructions to deny TTD benefits during the period when DeShong received unemployment compensation.

---

40. Op. at 1237–1238.

41. Op. at 1236–1237.