Lawrence TRUDELL, Appellant,

v.

John Brent HIBBERT, Debra Hibbert, and AAA Alaska Cab, Inc., Appellees.

No. S–13608.

Supreme Court of Alaska.

Feb. 17, 2012.

As Revised on Rehearing April 5, 2012.

Michael W. Flanigan, Walther & Flanigan, Anchorage, for Appellant.

Peter J. Maassen, Ingaldson, Maassen & Fitzgerald, P.C., Anchorage, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

CARPENETI, Chief Justice.

## I. INTRODUCTION

The employee of a contractor was injured while repairing a building; the contractor did not have workers' compensation insurance. The employee filed suit for workers' compensation benefits against his employer and against the owners of the building, alleging that the owners were "project owners" as defined in the Alaska Workers' Compensation Act and thus liable for securing workers' compensation. The employer then filed for bankruptcy. The owners denied liability on the basis that they were not "project owners." After a bench trial solely about whether the building owners were "project owners" or the injured worker's employers, the superior court decided that they were neither and

that they were not liable to pay worker's compensation to the injured worker, and awarded attorney's fees against the employee. Because it was error to interpret "project owners" as excluding the building owners, we reverse the superior court's decision.

## II. FACTS AND PROCEEDINGS

Lawrence Trudell was injured on June 13, 2006, when he fell while trying to descend a ladder from the roof of a structure on which he was working. At the time he was employed by Phillips Construction Co. (Phillips), a construction contracting company principally owned by Clayton Phillips and Trish Dorman.[1] Phillips did not have workers' compensation insurance, even though it was licensed by the State of Alaska.[2] The structure Trudell was working on was owned by John Brent Hibbert (Brent) and Debra Hibbert.

The Hibberts own and operate AAA Alaska Cab, Inc. (AAA Cab) in Kenai. The company is incorporated, with Brent Hibbert acting as president and Debra Hibbert acting as secretary-treasurer. Brent Hibbert is the sole shareholder. The Hibberts also own several pieces of property in the Kenai area and have what the superior court described as a "modest rental business." They own all of their real property as individuals. The cab company leases its office and "shop" from the Hibberts.

The building from which Trudell fell serves as both the Hibberts' residence and the cab company's business office.[3] The office is in a converted "mud room" measuring about 10 feet by 15 feet; it has some office equipment and a radio on which the Hibberts can monitor and communicate with the cab drivers. The cab company takes job applications in the office and has notices about drug testing there. Cab drivers come to the office to deposit cash and exchange tokens or credit

---

1. Dorman was Phillips's girlfriend and part owner of the company; she was not a party to this action.

2. AS 08.18.101(a) requires a construction contractor to provide proof of workers' compensation insurance when registering or renewing a contractor's license. Phillips was licensed in 2006. If Phillips had no employees when it got its contractor's license, it did not need to secure

workers' compensation insurance, but whenever it had employees, it was required to have workers' compensation insurance. AS 23.30.045(a), .239(a).

3. The office address was the address on the workers' compensation insurance the Hibberts got after Trudell's injury.

slips they receive as part of some accounts for cab service. Across the street from the home office is a garage or "shop" for the cab business.

The cab company and the Hibberts signed a lease agreement dated January 1, 2006. The lease agreement did not separate rent paid for the office from rent for the shop; it provided that the cab company "lease[d] the shop (1380 Nighthawk Ln) and office (1385 Nighthawk Ln) space" and required the cab company to pay utilities and taxes. It also required that any "damage to the building and supplies" be "fixed or repaired by tenant." The lease did not have a fixed rent. The trial court found that the "rental amount ... is apparently the amount of the home mortgage and utilities." The trial court "could not ... determine[ ]" if the cab company "absorbed all home utilities."

In May 2006 the Hibberts contracted with Phillips to repair the office-residence. The repair work initially consisted of re-siding the building, repairing the foundation under the cab office space, and installing soffit and fascia. The contract was later expanded to include roof repair on the office-residence and installation of eaves on the shop. The Hibberts paid cash for the job and got a discount for doing so. There was a dispute at trial as to who initiated the cash payment discussion.

Trudell worked on the repairs, tearing off the old siding, soffit, and fascia. He also helped install an entryway door for the office and worked on the foundation underneath the office. On June 13, 2006, he fell when he stepped onto a ladder belonging to Phillips; the ladder began to collapse and then fell with Trudell on it. At the time of the accident, Trudell was working on the roof of the office-residence installing an ice and water shield. Trudell fell about 25 feet to the ground and sustained serious injuries: He broke his back, became paralyzed from the waist down, lost most of his hearing, suffers extreme vertigo, and must use a catheter. He spent several months in the hospital. Phillips apparently did not file a report of

injury with the Alaska Workers' Compensation Board (the Board) as required by AS 23.30.070.

Trudell sued Clayton Phillips d/b/a Phillips and the Hibberts d/b/a AAA Cab in November 2006.[4] He also filed a lien on the Hibberts' property to secure payment of workers' compensation. He sought to foreclose on the lien he had filed, claiming that the Hibberts were responsible for payment of workers' compensation because they were "project owners" as defined in AS 23.30.045 and thus liable for securing workers' compensation. Phillips filed for bankruptcy in February 2007, and the case against him was stayed on March 20, 2007. A discharge was entered in the bankruptcy case on May 29, 2007.

The Hibberts filed their answer and simultaneously moved for summary judgment, arguing that AS 23.30.045 should be construed so that they did not fall within the definition of "project owner." Superior Court Judge Anna Moran denied the Hibberts' summary judgment motion on July 8, 2008. Relying on legislative history, Judge Moran decided that "[t]he term 'project owners' was intended to include all business entities, including investment groups, limited liability companies (LLCs), and other groups with no regular employees." She thought that Trudell's proposed interpretation of "project owner" was consistent with the statute and decided that there was "a question of fact as to whether [the Hibberts] were hiring [Trudell] to perform repairs and renovations while engaged in the course of their cab business."

After receiving additional discovery, Trudell filed an amended complaint, alleging in the alternative that he was the Hibberts' employee when the accident happened because, in addition to their cab company, the Hibberts also ran a property rental business. The Hibberts denied the new allegations.

The parties stipulated that the trial would be solely on the issue of the Hibberts' status as project owners or employers, and, if Trudell were successful, the case would then go

---

4. AAA Cab was not separately served with a summons, but in March 2007 an attorney entered an appearance on its behalf. The cab company did not participate actively in the litigation.

before the Board for a determination of workers' compensation benefits. Based on *Benson v. City of Nenana*,[5] the superior court ordered a bench trial.

The case went to trial in November 2008 before Superior Court Judge Charles T. Huguelet.[6] Trudell and the Hibberts were the only witnesses. The court also visited the cab company's office. Trudell testified about his relationship with Phillips, stating that he began working for Phillips sometime in November 2005. The following month another worker fell and broke his leg and ankle. Phillips did not have workers' compensation insurance at the time. Phillips did not pay Trudell regularly, and Trudell was living off his savings part of the time he worked for Phillips. Trudell estimated that Phillips owed him about $30,000 in wages and said that Phillips paid him about $2,000 from the money the Hibberts paid Phillips. Phillips "hinted" to Trudell that he would make Trudell a business partner at some point but never did. Trudell said that he never made an investment in Phillips and considered himself Phillips's employee even though Phillips was not paying him regularly.

In early 2006 Phillips drew up paperwork to have Trudell become an independent contractor, but the papers were never filed. According to Trudell, Phillips told him that Phillips would get workers' compensation coverage. Phillips secured some type of insurance that paid a small part of Trudell's hospitalization after the accident. At least two other people besides Trudell and Phillips worked for Phillips on the Hibberts' job.

Trudell also testified about the contract between Phillips and the Hibberts. He indicated that the Hibberts agreed to pay cash in exchange for a discount on the job and gave Phillips more than $10,000 in cash in one

payment.[7] Trudell described the nature of the work performed for the Hibberts, which included redoing the foundation underneath the office area in the house. Phillips also repaired the roof of the entire structure, including installation of an ice and water shield. Trudell described the accident and his resulting injuries.

Debra Hibbert testified about how she used the office space in the house. She also testified about the couple's property rentals, indicating that even though they owned and rented several pieces of property, they never bought property with the intention of renting it out. She testified that the cab company carried workers' compensation insurance when it had other office employees but did not carry workers' compensation insurance to cover the Hibberts.[8] The cab company did not have workers' compensation coverage in 2006.

Debra Hibbert was also the bookkeeper for the cab company, and she testified about its income and rent payments. She testified that the cab company had gross receipts of $613,000 in 2006, with a net income of $138,212. The cab company paid her and her husband together $84,856 in salaries in 2006. She agreed that the cab company paid them $15,563 in rent in 2006 and that this amount of rent was "just a few cents off" of the amount they paid for the home mortgage. She testified that when the couple contracted with Phillips, they were doing so in their individual capacity and not as the cab company. She also testified that the issue of workers' compensation insurance was not discussed with Phillips before the accident.

Brent Hibbert testified that he was the president of AAA Cab and described his duties in the cab business. He testified that he occasionally did minor repair work on the

---

**5.** 725 P.2d 490, 492 (Alaska 1986) (holding that worker injured while working on city project not entitled to jury trial on issue of whether he was a city employee or independent contractor under workers' compensation act).

**6.**· The case was assigned to Judge Huguelet sometime after the denial of summary judgment.

**7.** In his deposition, Brent Hibbert testified that the cash for the repair work came from his "savings" but that it was not withdrawn from

any account. There was thus apparently no way to trace the source of the money.

**8.** AS 23.30.240(a) permits the executive officers of a corporation to waive workers' compensation coverage, subject to approval of the director of the division of workers' compensation. Taxicab drivers with certain types of contracts are not covered by workers' compensation. AS 23.30.230(a)(7).

couple's rental units and had once or twice hired others to repair the buildings. According to Brent Hibbert, the repair work done by Phillips was part of a series of property improvements on the office-residence that began in 2005 and ended in 2007. Brent Hibbert said that Phillips introduced Trudell as his partner. Brent Hibbert testified that he had solicited other bids for the job but chose Phillips because the other bidders could not do the necessary foundation work under the office. Both of the Hibberts testified that Phillips offered them a discount on the construction job if they paid cash, which they agreed to do.

In his decision Judge Huguelet found that the Hibberts were not project owners or employers and therefore not liable for workers' compensation payments to Trudell. Judge Huguelet "respectfully disagree[d]" with Judge Moran's construction of AS 23.30.045, although he said that the differences in interpretation of the statute would not affect the outcome of Trudell's case. Judge Huguelet wrote that "[p]roject owner liability must be viewed in a manner that [was] consistent with the body of Alaska workers' compensation law." Quoting *Gaede v. Saunders,*[9] he wrote that "[t]he project owner's business must be a 'profit-making enterprise which ought to bear the costs of injuries incurred in the business' to fall within the [Alaska Workers' Compensation] Act." He also said that "[a]nalysis of project owner liability should reflect principles used to determine if there is an employer under the Act." He decided that what he called the Larson test ("project owner liability requires finding that a business has contracted out its usual work to others") was "reasonable and consistent with Alaska law." The court found that the construction project was mainly a home improvement project and that "[a]ny effect on the Hibberts' taxicab or rental business was incidental—not a factor in the decision to upgrade the home." Acknowledging that Trudell was "in a very difficult position," the trial court decided that the Hibberts were "also blameless" and that "holding them liable for [Trudell's] considerable injuries would be unjust and contrary to workers' compensation law."

The Hibberts then moved for an award of Alaska Civil Rule 82 attorney's fees as the prevailing party. Trudell opposed on the ground that under Alaska workers' compensation law, costs and attorney's fees generally cannot be awarded against an injured worker. The court awarded the Hibberts the Rule 82 attorney's fees they requested, as well as costs, for a total judgment of $16,081.49. Trudell appeals.

## III. STANDARD OF REVIEW

We interpret a statute using our independent judgment.[10] We interpret a statute "according to reason, practicality, and common sense, taking into account the plain meaning and purpose of the law as well as the intent of the drafters."[11] Our goal in interpreting a statute is "to give effect to the legislature's intent, with due regard for the meaning the statutory language conveys to others."[12] "We may apply a legal doctrine to undisputed facts without giving deference to the superior court."[13]

## IV. DISCUSSION

### A. The Usual Business Rule Does Not Limit Project Owner Status.

The central issue in this case is the interpretation of "project owner" in AS 23.30.045(f)(2). The legislature amended the Alaska Workers' Compensation Act in 2004, adding project owners to the entities potentially liable for workers' compensation benefits and extending the exclusive liability pro-

---

**9.** 53 P.3d 1126, 1127 (Alaska 2002).

**10.** *Nickels v. Napolilli,* 29 P.3d 242, 246–47 (Alaska 2001) (citing *Cook v. Botelho,* 921 P.2d 1126, 1129 (Alaska 1996)).

**11.** *Grimm v. Wagoner,* 77 P.3d 423, 427 (Alaska 2003) (quoting *Native Vill. of Elim v. State,* 990 P.2d 1, 5 (Alaska 1999)).

**12.** *Muller v. BP Exploration (Alaska) Inc.,* 923 P.2d 783, 787 (Alaska 1996) (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 905 (Alaska 1987)).

**13.** *Guttchen v. Gabriel,* 49 P.3d 223, 225 (Alaska 2002) (citing *Foss Alaska Line, Inc. v. Northland Servs., Inc.,* 724 P.2d 523, 526 (Alaska 1986)).

vision of the act to them.[14] In *Schiel v. Union Oil Co. of California*,[15] we held that those amendments did not violate an injured worker's equal protection or due process rights under the Alaska Constitution.[16] In *Anderson v. Alyeska Pipeline Service Co.*,[17] we refused to construe the phrase "project owner" according to common usage and held that Alyeska fell within the definition of "project owner" in the statute.[18] In this case we consider whether the phrase "in the course of the person's business" in the statutory definition of "project owner" limits project owner liability to instances when a business contracts out its usual work to others. We hold that it does not.

Alaska Statute 23.30.045 provides in pertinent part:

> (a) An employer is liable for and shall secure the payment to employees of the compensation payable under AS 23.30.041, 23.30.050, 23.30.095, 23.30.145, and 23.30.180–23.30.215. If the employer is a subcontractor and fails to secure the payment of compensation to its employees, the contractor is liable for and shall secure the payment of the compensation to employees of the subcontractor. If the employer is a contractor and fails to secure the payment of compensation to its employees or the employees of a subcontractor, the project owner is liable for and shall secure the payment of the compensation to employees of the contractor and employees of a subcontractor, as applicable.
>
> . . . .
>
> (f) In this section,
>
> (1) "contractor" means a person who undertakes by contract performance of certain work for another but does not include a vendor whose primary business is the sale or leasing of tools, equipment, other goods, or property;

> (2) "project owner" means a person who, in the course of the person's business, engages the services of a contractor and who enjoys the beneficial use of the work;
>
> (3) "subcontractor" means a person to whom a contractor sublets all or part of the initial undertaking.

Trudell argues that the plain meaning of the statute and the legislative history show that the legislature intended to define "project owner" broadly to cover any business that engages contractors for business purposes. Trudell notes that the legislature only exempted two groups from coverage: homeowners and vendors that primarily provide goods rather than services. He claims that this was a deliberate choice because the legislature was concerned about uninsured employers and wanted to provide an incentive to project owners to make sure the contractors they hired had workers' compensation insurance.

The Hibberts contend that the trial court properly interpreted the statute as limited to those situations in which an employer contracts out its own usual work to another. They argue that "in the course of the person's business" limits the scope of project owners to those situations in which a business contracts out "work that the business would ordinarily be expected to do itself." Like the appellant in *Anderson*,[19] the Hibberts assert that broadly construing "project owner" would have "dire consequences," exposing many small businesses to potential liability for workers' compensation.

### 1. Statutory language and legislative history

 In construing a statute, we look at the meaning of the words used and the legislative history.[20] We interpret a statute in light of its purpose.[21] If a word in a statute

---

14. Ch. 80, §§ 1–3, SLA 2004.

15. 219 P.3d 1025 (Alaska 2009).

16. *Id.* at 1037.

17. 234 P.3d 1282 (Alaska 2010).

18. *Id.* at 1287–88.

19. *Id.* at 1287–88.

20. *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192 (Alaska 2007) (citing *State v. Alex*, 646 P.2d 203, 208 n. 4 (Alaska 1982)).

21. *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 117 (Alaska 1992) (citing *Vail v. Coffman Eng'rs, Inc.*, 778 P.2d 211 (Alaska 1989)).

has more than one relevant meaning, we consider the context in which the word is used and the legislature's purpose in enacting the statute.[22] "Statements made by a bill's sponsor during legislative deliberations are relevant evidence when the court is trying to determine legislative intent."[23]

Alaska Statute 23.30.045(f)(2) defines "project owner" as "a person who, in the course of the person's business, engages the services of a contractor and who enjoys the beneficial use of the work." Unlike statutes in other states, the statutory language does not use the word "usual" or "regular" to limit the business to which the statute applies;[24] it simply says "in the course of the person's business."[25] The relevant dictionary definitions of "course" could support either party's interpretation of the statute. One definition is "[m]ovement in time: DURATION" while another is "[a] typical or normal manner of proceeding: regular development."[26] Because the statute is ambiguous, we look to the purpose of the project owner amendment and its legislative history to discern the scope of coverage.[27]

The legislative history contains some discussion of the meaning of "project owner." As initially introduced, Senate Bill 323 did not change the definition of "contractor" in AS 23.30.045 and defined "project owner" as "a person who, in the course of the person's business engages the services of a contractor for the performance of certain work and who enjoys the beneficial use of the work."[28] The bill was amended in the Senate Judiciary Committee to change the definitions of both "project owner" and "contractor."[29] Senator Ralph Seekins, the bill's sponsor, said that the amendment was made to "clarif[y] who is a contractor and who is a project owner."[30] According to Pamela LaBolle, president of the Alaska Chamber of Commerce, the Chamber of Commerce "suggested the amendments ... for the purpose of clarification."[31] The amendment removed the phrase "for the performance of certain work" from the definition of "project owner" and added to the definition of "contractor" the limitation that a contractor "does not include a vendor whose primary business is the sale or leasing of tools, equipment, other goods, or property."[32]

There was no further discussion of the definition of "project owner" at that time, but Senator Scott Ogan asked how the bill "affect[ed] a homeowner building his own house who has a sub-contractor do a few things."[33] Jack Miller, attorney for the Chamber of Commerce, answered that "it exclude[d] anyone who is a project owner who [was] not engaged in business."[34] In a later hearing,

**22.** *See Alaskans for Efficient Gov't, Inc. v. Knowles,* 91 P.3d 273, 276 (Alaska 2004) (citing *State,* 646 P.2d at 208).

**23.** *Beck,* 837 P.2d at 117 (citing *Madison v. Alaska Dep't of Fish & Game,* 696 P.2d 168, 176 (Alaska 1985)).

**24.** *Cf.* Mo. ANN. STAT § 287.040(1) (West 2005) (classifying as an employer "[a]ny person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on"); 77 PA. CONS.STAT. ANN. § 52 (West 2002) (imposing compensation liability when owner permits entry on his premises for work that is part of employer's regular business).

**25.** AS 23.30.045(f)(2).

**26.** WEBSTER'S II NEW COLLEGE DICTIONARY 266 (3d ed. 2005).

**27.** *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1234 (Alaska 2003).

**28.** Senate Bill (S.B.) 323, 23d Leg., 2d Sess. (2004).

**29.** Committee Substitute for Senate Bill (C.S.S.B.) 323, 23d Leg., 2d Sess. (2004).

**30.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 19 (Apr. 2, 2004) (statement of Sen. Ralph Seekins).

**31.** *Id.* (statement of Pamela LaBolle).

**32.** C.S.S.B. 323(JUD).

**33.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 19 (Apr. 2, 2004) (statement of Sen. Scott Ogan).

**34.** *Id.* (testimony of Jack Miller). Senator Seekins occasionally asked Miller to answer questions about the legislation. Legislators appeared to rely on Miller's testimony to understand the legislation, so we give Miller's testimony more weight in interpreting the statute than we would an ordinary witness. *Nelson v. Municipality of*

Miller said "that a residential homeowner, not as a business, who hires an individual to do renovations in his or her home retains no liability under the current law or this proposed legislation."[35] According to Senator Seekins, homeowners were excluded from liability as project owners because "they shouldn't have to rise to the same level of professional responsibility as a project owner."[36] These comments demonstrate that the legislature thought the law would apply to any business that hired contractors to remodel or renovate structures.

Nothing in the legislative history of the project owner amendments shows that the legislature intended to limit its application to cases where the injured worker was performing the usual business of the project owner.[37] The overriding concern of the legislature was to ensure that all workers were covered by workers' compensation and that workers' compensation was the exclusive remedy available to injured workers. We observed in *Schiel v. Union Oil Co. of California*[38] that the legislative goals of the project owner amendment included the following: "to ensure or expand workers' compensation coverage for workers, to increase workplace safety, to prevent 'double dipping,' and to provide protection from tort liability to those who [were] potentially liable for securing workers' compensation coverage."[39]

Senator Seekins, the sponsor of S.B. 323, highlighted the broad scope of coverage when he stated at an early hearing on the bill, "The intent here is to say that *everyone is covered* and you have an exclusive remedy."[40] In the sponsor statement, he wrote that the legislation would extend the rights of injured workers and "allow[ ] recourse for the payment of compensation benefits against *project owners,* as well as against contractors and subcontractors."[41] In response to concerns that the bill took away rights from workers and gave them nothing in return, Senator Seekins indicated that the legislation gave injured workers additional recourse because project owners would be responsible for workers' compensation benefits if neither the contractor nor the subcontractor had coverage.[42] At a later hearing, Senator Seekins told Senator Hollis French that workers benefitted from the legislation because a project owner would "have to make sure that work[ers'] compensation exist[ed] because if [he did] not, the project owner ha[d] to provide it."[43] Senator Seekins discussed the problem of employers who said that all of their employees were subcontractors, "the idea being that they don't want to have to pay workers' compensation insurance" and said that S.B. 323 "absolutely makes that impossible to happen."[44] In an email to Senator Seekins, Jack Miller wrote that S.B. 323 would

> have a positive impact for both workers and employers because it will emphasize the importance of confirming that all parties in the chain of contracting have the required insurance in place. That, in turn, will force project owners to use only quali-

Anchorage, 267 P.3d 636, 641 (Alaska 2011) (giving testimony of Miller on this legislation "greater weight" than the average witness).

**35.** Minutes, House Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 18 (Apr. 27, 2004) (testimony of Jack Miller).

**36.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 14 (Mar. 9, 2004) (statement of Sen. Ralph Seekins).

**37.** Neither does the legislative history show an intent to exclude those cases. *See Anderson v. Alyeska Pipeline Serv. Co.,* 234 P.3d 1282, 1289 (Alaska 2010) (noting that legislative history contained examples of "the oil and gas industry's use of contract labor").

**38.** 219 P.3d 1025 (Alaska 2009).

**39.** *Id.* at 1032.

**40.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 27–28 (Mar. 4, 2004) (statement of Sen. Ralph Seekins) (emphasis added).

**41.** S.B. 323 Sponsor Statement, Sen. Ralph Seekins (emphasis in original).

**42.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 16 (Mar. 9, 2004) (statement of Sen. Ralph Seekins).

**43.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 20 (Apr. 2, 2004) (statement of Sen. Ralph Seekins).

**44.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 27 (Mar. 4, 2004) (statement of Sen. Ralph Seekins).

fied and fully insured contractors and subcontractors on their projects. If they fail to do so and a contractor or subcontractor does not have the required insurance the claim would be covered under the project owner's policy.[45]

Senator Seekins stated that the legislation "mean[t] that the project owner, before he can hire that subcontractor or contractor has to make sure that those people are covered or carry that coverage, themselves"[46] and that "everyone [up] the chain must make sure that every worker on the job is covered no matter who they work for."[47]

The legislature discussed whether the project owner amendments expanded the requirement for businesses to purchase workers' compensation insurance. The discussion showed that legislators understood that project owners would likely not need to purchase additional workers' compensation insurance.[48] But legislators noted that project owners risked liability if they did not require contractors to provide proof of workers' compensation coverage.[49] According to Senator Seekins, project owners only had to require proof of workers' compensation coverage "[t]hrough certificates of insurance" from a contractor in order to protect themselves from liability.[50] Senator Con Bunde thought "that project owners should want to have some kind of workers' compensation coverage as well, in the event someone was fraudulent in their representation."[51] At a later hearing, Senator Ogan said that the legislation would "require due diligence on the part of a project owner" and noted that the bill might "motivate contractors and subcontractors to 'skate' more because they will not be liable in the end."[52]

The legislature understood that businesses that usually did not have workers' compensation coverage would need to be sure their contractors had it or get it themselves. According to Jack Miller,

> this legislation [did not] require the procurement of a workers' compensation policy when a group of people, say an investment group, organize without any employees. However, when a building contractor is hired a certificate of insurance would need to be obtained in order to ensure that the contractor has a workers' compensation policy.... If the contractor didn't have a workers' compensation policy, the contractor still has the independent obligation to secure the workers' compensation benefit payments to its injured workers. If all of the aforementioned fails, the project owner would have liability for the workers' compensation payments and simultaneously couldn't be the subject of a tort remedy.... [53]

**45.** Email from Jack Miller, Att'y, Alaska Chamber of Commerce, to Sen. Ralph Seekins (Mar. 8, 2004, 16:56 AKST).

**46.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 22 (Mar. 4, 2004) (statement of Sen. Ralph Seekins).

**47.** *Id.* at 21.

**48.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 20 (Apr. 2, 2004) (statement of Sen. Hollis French); Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 16 (Mar. 9, 2004) (statements of Sen. Ralph Seekins & Sen. Hollis French); Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 23 (Mar. 4, 2004) (statement of Sen. Con Bunde).

**49.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 11 (Apr. 16, 2004) (testimony of Jack Miller).

**50.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 23 (Mar. 4, 2004) (statement of Sen. Ralph Seekins).

**51.** *Id.* at 25.

**52.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 35 (Apr. 14, 2004) (statement of Sen. Scott Ogan). Senator Ogan expressed concern that the State, as "the largest project owner in the state, could be liable for workers' compensation if someone doesn't do their homework." *Id.* at 34. Mr. Miller explained that AS 23.30.045 already permitted the State to withhold contractual payments to pay for workers' compensation insurance if a contractor did not maintain its workers' compensation coverage. *Id.* at 35.

**53.** Minutes, House Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 24–25 (Apr. 27, 2004) (statement of Jack Miller).

Miller also said that "[i]n the event of bankruptcy and no workers' compensation policy by the contractor, the remedy against the project owner would be for workers' compensation benefits."[54] In sum, the statutory language and legislative history support Trudell's position that the legislature intended the project owner amendments to apply broadly, to ensure both that workers received workers' compensation benefits and that those who were potentially liable for those benefits would be protected against a lawsuit in tort by the exclusive remedy provision of the act.

### 2. The usual business rule

In the course of trying to determine the proper interpretation of "project owner," the superior court applied the Larson test—"project owner liability requires finding that a business has contracted out its usual work to others"—because it was "reasonable and consistent with Alaska law." The court determined that "[a] nexus between the claimant's work and the project owner's business [or] product must be proven in order to impose liability." Concluding that there was no connection between Trudell's construction activities—which the court characterized as "a home improvement project"—and the Hibberts' taxicab or property management businesses, the superior court ruled against the plaintiff.

We disagree with the superior court's conclusion that the usual business rule is relevant to determining the meaning of "project owner." The superior court, faced with two theories of liability—project owner liability and employer liability—used principles from

the latter to decide the former. We declined to apply the usual business rule in construing an earlier version of AS 23.30.045 in *Thorsheim v. State*.[55] *Thorsheim* involved a claim for death benefits on behalf of a widow whose husband was killed in a plane crash while flying a Department of Fish and Game employee on a stream survey.[56] The decedent's employer, who did not have workers' compensation coverage, had contracted with the State to provide flying services.[57] Evidence in the record showed that the Department of Fish and Game "maintained its own fleet of airplanes" but at times "this fleet was inadequate to meet the total demands" of the department.[58] As a result, "a portion of [the] flying work had been contracted out to private carriers."[59] At that time "contractor" and "subcontractor" were not defined in AS 23.30.045.[60] We declined to follow cases from states where statutes defining coverage referred to work that was "in the line of [the employer's] usual business"; instead, we adopted alternate definitions of "contractor" and "subcontractor."[61] We held that the Department of Fish and Game and the Department of Administration were not contractors but "acted as an integral part of the State of Alaska" in contracting with Thorsheim's employer.[62] Because the State was not a contractor, it was not a statutory employer, and Thorsheim's widow was denied benefits.[63]

The legislature adopted the definitions of "contractor" and "subcontractor" used in *Thorsheim* when it amended section .045 in 1972.[64] Before passage of the project owner amendment, a business owner did not come

---

54. *Id.* at 25

55. 469 P.2d 383, 387–88 (Alaska 1970).

56. *Id.* at 384–85.

57. *Id.* at 385.

58. *Id.*

59. *Id.*

60. *Id.* at 387.

61. *Id.* at 387–89 (quoting *Evans v. Hawkins*, 114 Ga.App. 120, 150 S.E.2d 324, 326 (1966)).

62. *Id.* at 389.

63. *Id.* at 390.

64. *See* ch. 166, § 3, SLA 1972 (defining "contractor" as "a person who undertakes by contract performance of certain work for another" and "subcontractor" as "a person to whom a contractor sublets all or part of his initial undertaking"). At the same time the legislature prohibited the State from entering into a contract with a business unless the business provided proof of workers' compensation insurance and made the State liable for workers' compensation benefits if the contractor did not in fact have coverage. *Id.*

within the scope of the statutory-employer definition unless the business owner was a contractor who subcontracted part of the contract.[65]

The Larsons' treatise identifies two purposes of statutory-employer legislation: (1) "to protect employees of irresponsible and uninsured subcontractors by imposing ultimate liability on the presumably responsible principal contractor, which has it within its power, in choosing subcontractors, to pass upon their responsibility and insist upon appropriate compensation protection for their workers"[66] and (2) "to forestall evasion of the act by those who might be tempted to subdivide their regular operations among subcontractors, thus escaping direct employment relations with the workers and relegating them for compensation protection to small contractors who fail to carry ... compensation insurance."[67] The usual business rule addresses the second purpose, but the legislative history of the project owner amendment suggests that the legislature was concerned more with the first purpose and wanted those who hired contractors to ensure that the contractors and subcontractors had workers' compensation coverage or be liable themselves.

We also note that application of the usual business rule in other states does not always extend the workers' compensation exclusivity shield to owners.[68] The Hibberts assert that Idaho's definition of a statutory employer "plainly attempts to capture the same concept as Alaska's 'project owner.'" Yet in applying its statutory-employer statute, the Idaho Supreme Court permitted a negligence suit to go forward against the owner of a construction site, even though the injured worker received workers' compensation benefits from his direct employer, a subcontractor on the job.[69] The Idaho court applied the usual business rule and decided that the usual business of the owner, a retail store, did not include building construction or roof installation.[70] The legislative history of the Alaska project owner amendment mandates a different result: The legislature clearly stated its intent to extend liability for workers' compensation and protection from negligence suits up the contracting chain to business owners who engaged general contractors on construction projects.[71]

The superior court also wrote that "[a]nalysis of project owner liability should reflect principles used to determine if there is an employer under the Act. Relative nature of the work analysis is also helpful." But we explicitly rejected using the relative nature of the work test to establish a statutory-employer relationship in *Everette v. Alyeska Pipeline Service Co.*[72] There, we stated that the relative nature of the work test was not "useful" to determine whether the injured worker was a statutory employee of Alyeska

**65.** *Everette v. Alyeska Pipeline Serv. Co.*, 614 P.2d 1341, 1346 (Alaska 1980) (citing *Thorsheim*, 469 P.2d at 389–90).

**66.** 4 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 70.04 (2008) (footnotes omitted).

**67.** *Id.* at § 70.05 (footnotes omitted). Some state statutes reflect these alternative bases for statutory-employer status. *See, e.g.,* Idaho Code Ann § 72–223(1) (2006) (protecting from third-party liability (1) employers of contractors and subcontractors who have complied with workers' compensation laws and (2) persons who are "virtual proprietors or operators"). The Idaho Supreme Court labeled them "category one" and "category two" statutory employers. *See Pierce v. Sch. Dist. No. 21*, 144 Idaho 537, 164 P.3d 817, 819 (2007).

**68.** *Robison v. Bateman–Hall, Inc.*, 139 Idaho 207, 76 P.3d 951, 956 (2003); *Zizza v. Dresher*

*Mech. Contractors, Inc.*, 358 Pa.Super. 600, 518 A.2d 302, 305 (1986).

**69.** *Robison*, 76 P.3d at 952–53, 957.

**70.** *Id.* at 956–57.

**71.** Minutes, House Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 11 (Apr. 27, 2004) (statement of Sen. Ralph Seekins); Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 35 (Apr. 14, 2004) (testimony of Jack Miller); Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 20 (Apr. 2, 2004) (statement of Sen. Ralph Seekins); Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 15 (Mar. 9, 2004) (statement of Sen. Con Bunde); Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 20–21 (Mar. 4, 2004) (statement of Sen. Ralph Seekins).

**72.** 614 P.2d 1341, 1346 n. 5 (Alaska 1980).

during pipeline construction.[73] Because the project owner amendment extends statutory-employer liability up the contracting chain to owners, the relative nature of the work test does not determine project-owner status.

We conclude that it was error to incorporate the usual business rule into the definition of "project owner" in AS 23.30.045(f)(2). Even if the statutory language is ambiguous, the legislative history demonstrates the intent to cover many more situations than are covered by the usual business rule.

### B. The Hibberts Were Project Owners As Defined In AS 23.30.045.

Having determined that the usual business rule does not limit project owner status, we turn to the question whether the Hibberts were "project owners" under AS 23.30.045. For even if the usual business rule is not a limit on the definition of "project owner," a project owner must still be a business.[74] Although the superior court stated that "[t]he analysis [of project owner liability] should not end with a *business* or *residential* determination" but should include an evaluation of "the nexus between the contractor's activities and the project owner's business," the superior court considered whether the Hibberts were acting as homeowners when they hired Phillips to repair their office-residence. The court found that "the Hibberts were engaged in a home improvement project that lasted three summers" and that "[a]ny effect on the Hibberts' taxicab or rental businesses was incidental—not a factor in the decision to upgrade the home."

The court determined that "[t]he roofing and siding project was not related to the Hibberts' profit-making businesses"; it called the Hibberts "homeowners and consumers."

In interpreting the definition of "project owner" the superior court said that "[t]he project owner's business must be a 'profit-making enterprise which ought to bear the costs of injuries incurred in the business' to fall within the Act." The quoted language is from a test we adopted to determine when someone is an employer for purposes of the Workers' Compensation Act rather than a consumer.[75] The test elaborates on the "business or industry" definition of "employer" in the Workers' Compensation Act.[76] We have noted that the distinction between productive and consumptive uses is based in part on a business's ability to pass on to consumers the cost of workers' compensation insurance.[77] We agree with the superior court that this test is useful to differentiate businesses from homeowners for purposes of the project owner amendments. But we disagree with the superior court's application of the test to the facts of this case.

The Hibberts have two profit-making businesses that are able to pass on the cost of workers' compensation insurance to consumers—their cab business[78] and their property rental business.[79] The Hibberts did not take a home-office deduction for a part of their home used exclusively for business.[80] Instead, the Hibberts entered into a commercial lease with the cab company. The cab company rented its shop and office from the Hibberts, and, as the trial court found, the rent paid by the cab company was the full amount of the home mortgage.[81] The lease

73. *Id.*

74. AS 23.30.045(f)(2).

75. *Gaede v. Saunders*, 53 P.3d 1126, 1127 (Alaska 2002) (quoting *Kroll v. Reeser*, 655 P.2d 753, 757 (Alaska 1982)).

76. *Id.* at 1126–27.

77. *Nickels v. Napolilli*, 29 P.3d 242, 253 (Alaska 2001).

78. The cab business had gross receipts of $613,000 in 2006, with a net income of $138,212 after paying the Hibberts $84,856 in salaries,

paying $15,563 in rent, (which covered all of the house mortgage) and paying all of the utilities (septic, electric, gas, and sanitation), telephone, property taxes, and non-liability insurance on the property, collectively totaling over $14,500.

79. The property rental business reported a profit of $15,923 in 2006.

80. *See Tilman v. United States*, 644 F.Supp.2d 391, 399–400 (S.D.N.Y.2009) (citing *Weissman v. Comm'r*, 751 F.2d 512, 514 (2d Cir.1984)) (discussing home-office deduction).

81. The lease did not specify that the cab company was leasing only a small part of the office-

agreement between the Hibberts and the cab company also made the cab company responsible for all utilities, insurance, and taxes, and it required that "any damage to the building and supplies will be fixed or repaired by tenant." Debra Hibbert testified that the cab company paid the expenses of the properties it was associated with rather than paying a rent check to the Hibberts. The Hibberts reported the rent they received from the cab company as income to their rental business and took depreciation on the shop as a deduction against that income.[82] The cab company in turn deducted the rent it paid the Hibberts—the amount of the mortgage—as a business expense. Even though the Hibberts and the cab company did not engage in arms-length negotiations to establish a rental amount, they nonetheless engaged in a commercial transaction when they signed the lease.

The Hibberts' contract with Phillips and the work performed under it arguably had both business and personal purposes. Brent Hibbert testified about other work that was done on the office-residence in the years before and after the foundation and roof repair, emphasizing non-business aspects of that work. Debra Hibbert testified that the renovations on which Trudell worked were not intended "primarily" to benefit the business. The superior court focused its analysis on the reasons the Hibberts gave for the roof and foundation repair, finding that "[a]ny effect on the Hibberts' taxicab or rental businesses was incidental—not a factor in the decision to upgrade the home."

■ The proper inquiry to determine whether the project was business-related is not the intent of the property owner, but the benefit to the business from the project. If intent alone determined project-owner status, a business owner could always evade responsibility in a situation that might have both business and personal purposes by saying that the primary intent was personal. A more appropriate inquiry is the extent to which the business benefitted from the work and what connection there was between the repair work and the business.[83]

Here, the Hibberts' two profit-making businesses, the cab company and the rental business, both gained from the remodel work.[84] The cab business benefitted from the repairs because they shored up the foundation under its office, provided a new door for the office, and repaired the office roof.[85] The Hibberts' rental business benefitted because it had improved property to rent.

The Hibberts assert that their contract with Phillips was a personal expense rather than a business one because they paid cash for it; according to the Hibberts, they paid all business expenses with checks. But the business and personal expenses and payments were commingled to such an extent here that the Hibberts' claim is problematic. For example, the lease agreement required the cab company to pay taxes on the property it rented, yet the records showed that it paid all the taxes on the entire parcel and the Hibberts took a home-mortgage deduction on their personal income tax return. The 2005 profit/loss statement for the cab company shows "land" expenses, that are different from the rental payments, but the cab company did not own land. And the cash pay-

---

residence. It said that the cab company "lease[d] the shop (1380 Nighthawk Ln) and office (1385 Nighthawk Ln) space" from the Hibberts.

**82.** Even though the lease required the cab company to pay utilities and Debra Hibbert testified that the cab company paid the expenses of the properties, the Hibberts took a deduction for utility payments from the rent they reported receiving on the office and shop on their personal income tax returns.

**83.** Cf. *Bartoo v. Buell*, 87 N.Y.2d 362, 639 N.Y.S.2d 778, 662 N.E.2d 1068, 1070 (1996) (holding that to qualify for exemption for one-

and two-family dwellings under New York scaffolding law, work must directly relate to residential use of the home).

**84.** The Hibberts' rental business was not limited to their lease agreement with the cab company. They owned five pieces of property, including what Debra Hibbert conceded was "valuable commercial property," and rented out at least three of them.

**85.** Indeed, Brent Hibbert testified that Phillips was chosen from among several bidders because the others could not do the necessary foundation work under the office. Even the choice of contractor benefitted the cab company.

ments for the remodel made it impossible to determine who actually paid for the repairs.

The Hibberts contend that if they are found liable as project owners, any person with a home office who gets repair work done on his or her home could face liability for workers' compensation. The Hibberts' office is not a typical home-office situation: Their home also served as an office for two businesses, one of which was a putatively separate corporation that entered into a commercial lease for the office space, paid all of the expenses of the home and generated income in the hundreds of thousands of dollars. In any event, the legislature wanted project owners to employ only contractors who had workers' compensation; it recognized that the project owner amendments would require "due diligence" on the part of project owners and that project owners might choose to buy their own workers' compensation policy to protect themselves.[86] The Hibberts were sophisticated business owners who were familiar with sales tax and workers' compensation requirements. Although the trial court considered the Hibberts "blameless," they failed to inquire as to the workers' compensation coverage for employees working on their premises; they also willingly agreed to pay cash for a large remodel project and to accept a job that charged $25 in sales tax on a bid of approximately $28,000. The cab company at times carried workers' compensation insurance for office workers, so the Hibberts were aware that a business needed it for employees but not for owners or corporate officers. They could have inquired of Phillips about his workers' compensation coverage before the accident, as the legislature envisioned.[87]

We agree with Trudell that this case is analogous to *Sauve v. Winfree*.[88] There, an employee of a corporation was injured at work; after receiving workers' compensation benefits, she sued the building owner for negligence.[89] The building owner was a partnership composed of the two officers and shareholders of the corporation that employed the injured worker.[90] The officers raised the defense that they were the injured worker's co-employees and thus protected by the exclusivity provision of the workers' compensation act.[91] We noted there that "[t]he circumstance of separate legal entities owning the business and its premises ... has ramifications."[92] Because the officers chose "to have different business organizations own the real estate and the business," as landlords they were not the worker's co-employees.[93]

Here, the Hibberts chose to enter into a commercial lease with the cab company to rent the office-residence from them. In the lease agreement, they did not allocate a specific portion of the residence as the office of the cab company, nor did they prorate a part of the home mortgage as rent. Instead, the cab company paid the full amount of the home mortgage. They deducted the full amount of rent as a business expense of the cab company and reported the rent as income for their property business. They cannot disavow the commercial nature of the transaction when it does not benefit them. The nature of the repairs to the office-residence and the structure of the lease agreement persuade us that, as a matter of law, the Hibberts were acting in their business capacity as commercial landlords when they contracted with Phillips. They are therefore project owners as defined in AS 23.30.045(f)(2).

86. Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 35 (Apr. 14, 2004) (statement of Sen. Scott Ogan); Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 20 (Apr. 2, 2004) (statement of Sen. Ralph Seekins); Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 25 (Mar. 4, 2004) (statement of Sen. Con Bunde).

87. Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 23 (Mar. 4, 2004) (statement of Sen. Ralph Seekins).

88. 907 P.2d 7 (Alaska 1995).

89. *Id.* at 8.

90. *Id.*

91. *Id.*

92. *Id.* at 10.

93. *Id.*

Trudell's situation is one that the legislature hoped to prevent when it enacted the project owner amendments. The problem with uninsured contractors and their attempts to require employees to become independent contractors to avoid workers' compensation liability was discussed in hearings in both houses.[94] The legislature intended that someone in the contracting chain would have workers' compensation insurance; the legislation was limited to businesses, and for the most part businesses are required to carry workers' compensation coverage.[95] As Senator Seekins said, "The intent here is to say everyone is covered and you have an exclusive remedy." [96] Trudell, limited to the exclusive remedy, is entitled to the compensation that the legislature intended.[97]

## V. CONCLUSION

The judgment of the superior court is REVERSED, and the case is REMANDED to the superior court for entry of judgment that the Hibberts are project owners as defined in AS 23.30.045(f)(2). STOWERS, Justice, dissenting in part.

CHRISTEN, Justice, not participating.

STOWERS, Justice, dissenting in part.

STOWERS, Justice, dissenting in part.

The court today considers whether the phrase "in the course of the person's business" in the statutory definition of "project owner" limits project owner liability to instances when a business contracts out its usual work to others, and holds that it does not.[1] I do not disagree with the court's legal interpretation of AS 23.30.045.

The court concludes, however, that the Hibberts' contract with Trudell's employer and the work performed under it "arguably

---

**94.** Minutes, House Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 22–24 (Apr. 27, 2004) (statement of Sen. Ralph Seekins); Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 27–28 (Mar. 4, 2004) (testimony of Jack Miller).

**95.** Minutes, Sen. Judiciary Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 11 (Apr. 16, 2004) (testimony of Jack Miller).

**96.** Minutes, Sen. Labor & Commerce Comm. Hearing on S.B. 323, 23d Leg., 2d Sess. 27–28 (Mar. 4, 2004) (statement of Sen. Ralph Seekins).

**97.** The dissenting opinion, while agreeing that the superior court erred in its interpretation of AS 23.30.045, (Dissent at 345) would remand for the superior court to apply the proper legal test to determine whether the Hibberts are project owners. (Dissent at 346) But where application of the rule to the facts before the court can lead to only one result, we have adopted that result and have declined to remand. *See Kelly v. State, Dep't of Corrs.*, 218 P.3d 291, 302–03 (Alaska 2009) (holding that prison guard had satisfied all elements required to show that he had suffered an injury, obviating need for remand on that issue, where guard showed he had received traumatic death threat constituting "extraordinary and unusual" stress); *Guttchen v. Gabriel*, 49 P.3d 223, 226–27 (Alaska 2002) (holding that while resolution of "issue typically involv[ing] a factual component ... is ... usually consigned to the superior court's discretion," remand unnecessary where facts had been fully presented at superior court level); *State v. Wentz*, 805 P.2d 962, 967 n. 7 (Alaska 1991) (holding "exceptional

case" aggravator needed to enhance presumptive sentence had been established, obviating need for remand, where man with history of assaultive behavior beat his particularly vulnerable wife almost to death, causing permanent brain damage). This is such a case.

The undisputed facts are that (1) the Hibberts have two profit-making businesses run from their home; (2) these businesses enjoyed gross receipts in excess of $600,000 and, considering net income plus salaries, returned about $240,000 to the Hibberts yearly and fully paid their mortgage, all utilities, and property taxes; (3) the businesses are able to pass on the cost of workers' compensation insurance to their customers, especially the cab business; (4) the businesses benefitted directly from the repair work because it provided the businesses the locales from which they operated (shoring up the foundations, repairing the roof, etc. of the cab company office, and providing enhanced rental space for the rental business); (5) the lease between the Hibberts and the cab company made no allocation of a specific portion of the house as the cab company's office nor did it prorate a part of the mortgage as rent; rather, under the terms of the lease, the cab company was to pay the full amount of the mortgage (as well as all utilities and property taxes). When looking at the extent to which the businesses benefitted from the work and the connection between the work and the business, and given the size of the businesses and their ability to pass on the costs of workers' compensation insurance, the only possible conclusion is that the Hibberts were project owners.

**1.** Op. at 335.

had both business and personal purposes,"[2] notwithstanding that the superior court found as a matter of fact that the Hibberts were engaged in a home improvement project when Trudell fell and injured himself, and that any effect of Trudell's work on the Hibberts' taxicab or rental business was "incidental" and that the roofing and siding project was not related to the Hibberts' profit-making business. The court criticizes the superior court for focusing on the Hibberts' intent when they contracted with Trudell's employer; the court explains that the proper inquiry to determine whether the project was business related is to focus on the benefit to the business.[3] I do not disagree with this interpretive rule. But the court then makes and weighs its own "findings": the court explains "the Hibberts' two profit-making businesses, the cab company and the rental business, both gained from the remodel work"; "[t]he cab business benefitted from the repairs because they shored up the foundation under its office, provided a new door for the office, and repaired the office roof"; and the Hibberts' business and personal expenses and payments were commingled to the extent that these facts rendered "meaningless" the Hibberts' claim that their contract with Trudell's employer was a personal expense.[4] In essence, the court finds, contrary to the superior court's findings, that the Hibberts' roof repair project was business related; concludes that the Hibberts are project owners as defined in AS 23.30.045(f)(2); and remands for the superior court to enter judgment in favor of Trudell. It is the court's unwarranted intrusion into the superior court's function as fact-finder that I disagree with, and I therefore respectfully dissent in part.

The history of this case illustrates the basis of my disagreement with the court's resolution of this appeal. After the Hibberts filed their motion for summary judgment—

which argued that their contract with Trudell's employer did not fall within AS 23.30.045's definition of "project owner"—the superior court ruled correctly that there was "a question of fact as to whether [the Hibberts] were hiring [Trudell] to perform repairs and renovations while engaged in the course of their cab business."[5] The case went to trial; the parties were the only witnesses, and the superior court inspected the Hibberts' home/cab company office.[6] At the conclusion of the trial, the court made factual findings that the construction project was mainly a home improvement project and that any effect on the Hibberts' taxicab or rental businesses was "incidental—not a factor in the decision to upgrade the home."[7] The superior court made a legal conclusion that the Hibberts therefore were not project owners or employers, and therefore not liable for workers' compensation payments to Trudell.[8]

I agree with this court that the superior court's *legal* analysis was erroneous through its application of the Larson test to determine the proper meaning of "project owner."[9] But this does not end the analysis; the question then becomes whether the superior court's *factual findings* were erroneous. We review the superior court's factual findings for clear error, reversing only when the court is left with the definite and firm conviction that a mistake has been made.[10] Notably, the court does not determine that the superior court's factual findings were clearly erroneous, nor could it in my opinion. Rather, the court proceeds to review and weigh the facts, emphasizing its own findings as described above. But this is not the supreme court's proper function.

I therefore dissent from the part of the opinion whereby the court finds that the Hibberts' roof repair project was business related, and the remand order for the superi-

---

2. Op. at 342, 343.

3. Op. at 343.

4. Op. at 343.

5. Op. at 333.

6. Op. at 334.

7. Op. at 334–35.

8. Op. at 335.

9. Op. at 340.

10. *Shooshanian v. Dire*, 237 P.3d 618, 622 (Alaska 2010) (citations omitted).

or court to enter judgment that the Hibberts are project owners as defined in AS 23.30.045(f)(2). Rather, I would reverse and remand for the superior court to apply the proper legal test to the facts and determine whether the Hibberts are project owners under the statute and the legal test established by this court's opinion.