*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| CHRISTOPHER LOVELY, STEVEN ADAMS, ROBERT DEFOE, CHARLES VAN CURREN, and DUSTIN LEAVITT, | Supreme Court No. S-16967 |
| | Superior Court No. 3AN-15-06199 CI |
| Appellants, | O P I N I O N |
| v. | No. 7434 – March 20, 2020 |
| BAKER HUGHES, INC.; BAKER HUGHES OILFIELD OPERATIONS, INC.; and BAKER PETROLITE CORPORATION, | |
| Appellees. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Michael W. Flanigan, Flanigan & Bataille, Anchorage, for Appellants. Steven S. Tervooren, Hughes White Colbo Wilcox & Tervooren, LLC, Anchorage, and Mark A. Solheim and Stephen P. Laitinen, Larson King, LLP, St. Paul, Minnesota, for Appellees.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Stowers, Justice, not participating.]

MAASSEN, Justice.

I.   INTRODUCTION

A construction contractor's employees were injured on the job and received workers' compensation benefits from their employer. The workers later brought a negligence suit against three other corporations: the one that had entered into the construction contract with their employer, that corporation's parent corporation, and an affiliated corporation that operated the facility under construction. The three corporations moved for summary judgment, arguing that all three were "project owners" potentially liable for the payment of workers' compensation benefits and therefore were protected from liability under the exclusive liability provision of the Alaska Workers' Compensation Act. The superior court granted the motion, rejecting the workers' argument that status as a "project owner" was limited to a corporation that had a contractual relationship with their employer.

We conclude that a project owner, for purposes of the Act, must be someone who actually contracts with a person to perform specific work and enjoys the beneficial use of that work. We further conclude that the workers raised issues of material fact about which of the three corporate defendants satisfied this definition. We therefore reverse the superior court's grant of summary judgment.

II.   FACTS AND PROCEEDINGS

A.   The Construction Contract

Baker Petrolite Corporation operated a chemical transfer facility[1] on the Kenai Spur Highway. A related entity, Baker Hughes Oilfield Operations, Inc., entered into a construction contract with UIC Construction, LLC for construction of a replacement "Baker Petrolite Facility" with more capacity and storage space. The form

---

[1]   We note some disagreement in the witness testimony about whether the facility would be more properly characterized as a "warehouse." Because it does not appear to be a critical issue, we use the same term as the superior court.

contract, dated April 5, 2013,[2] was signed by David Emerson, vice president of Baker Hughes Oilfield Operations, as "Owner," and by Chris Phillips for UIC Construction. Both Baker Hughes Oilfield Operations and Baker Petrolite are subsidiaries of Baker Hughes, Inc., a Delaware corporation with a principal place of business in Texas.[3]

The contract purported to represent "the entire and integrated agreement between the parties[,] . . . supersed[ing] prior negotiations, representations or agreements, either written or oral." The contract listed a number of documents which could pre-date or post-date the contract and which were to be considered "as fully a part of the Contract as if attached to this Agreement or repeated herein." The contract provided that it would govern over any inconsistent documents except a modification.

One contract exhibit included as a "Contract Document" was a June 2013 letter stating that Baker Petrolite and UIC Construction had reached a "preliminary agreement" about "renovation of Baker Petrolite Corporation's existing facility" on the Kenai Spur Highway. Like the contract itself, it was signed by Phillips and Emerson, but no corporate name accompanied Emerson's signature. The names of both Baker Hughes and Baker Hughes Oilfield Operations appeared at the top of the letter.

---

[2]      The contract was "AIA Document A102 – 2007," which contained a provision that made certain "Contract Documents," including "Conditions of the Contract," "fully a part of the Contract." The parties also signed a form "General Conditions of the Contract for Construction." The documents were attached as separate exhibits in pleadings before the superior court, but we refer to both documents as one contract, as the parties apparently intended.

[3]      There is no evidence in our record of the precise relationship among the three Baker Hughes entities, but the superior court stated in its summary judgment order, and the parties appear to agree, that Baker Hughes is the parent corporation and Baker Hughes Oilfield Operations and Baker Petrolite are its subsidiaries.

Several contract provisions are particularly relevant to the parties' arguments on appeal. The contract defined "Owner" generally in § 2.1.1 as "the person or entity identified as such in the Agreement" and included in the definition "the Owner or the Owner's authorized representative." The contract's first page identified the "Owner" as Baker Hughes Oilfield Operations, Inc. and the "Contractor" as UIC Construction, LLC. At § 1.1.2 the contract provided that "[t]he Contract Documents shall not be construed to create a contractual relationship of any kind . . . between any persons or entities other than the Owner and the Contractor."

In a section addressing indemnification, the contract defined "OWNER" more expansively.[4] Section 3.18.3.3 provided:

> As used in this indemnity, the name "OWNER" means Owner and its agents, employees, subcontractors, independent contractors, officers, and directors, but not any CONTRACTOR PARTY; and the name "OWNER" means in addition OWNER'S successors and assigns, all of its affiliated companies, and all of its parent and subsidiary corporations, but the foregoing excludes any separate contractors performing construction work on the Project.

For purposes of the indemnity provision, thus, "OWNER" included both "Owner" (i.e., Baker Hughes Oilfield Operations or its "authorized representative") and "its affiliated companies." "CONTRACTOR PARTY" was defined in another section to include UIC Construction's employees and subcontractors.

One indemnification provision required the "CONTRACTOR . . . to the fullest extent permitted by law[] to indemnify . . . OWNER" for damages "from ALL CLAIMS, DEMANDS, AND CAUSES OF ACTION FOR ALL DAMAGES that arise out of . . . the injury to or the death of any person, including . . . any natural person

---

[4]     The contract distinguished terms written in all capital letters from those that were not.

included within the definition[] of . . . CONTRACTOR PARTY." The indemnification provision excluded "any liability arising out of the sole negligence or willful misconduct of Owner" as well as "THE OWNER'S SOLE NEGLIGENCE AND WILLFUL MISCONDUCT." But another indemnification provision required the "CONTRACTOR[,] . . . to the fullest extent permitted by law, to indemnify . . . OWNER" "EVEN IN THE EVENT OF THE OWNER'S SOLE NEGLIGENCE" "to the extent that such injury [was] covered by worker[s'] compensation laws and benefits." In a different section the "Contractor" agreed to indemnify and hold harmless the "Owner and its agents and employees from and against claims, damages, losses, and expenses . . . arising out of or resulting from the failure of the Contractor to perform its obligations . . . as stated in the Contract Documents."

The contract required the "Contractor" to name "[t]he Owner, its affiliates, parents and subsidiaries . . . as insureds or additional insureds" in most of the contractor's insurance policies, but not its workers' compensation policy. The "Contractor" was also required to purchase workers' compensation insurance and provide proof of it to the "Owner." The "Owner" had "the absolute right to cancel th[e] Agreement" if the "Contractor" failed to provide timely proof of workers' compensation coverage. The contract set amounts of required insurance coverage, including workers' compensation, and provided that the "Owner may (but shall not be obligated to) purchase such insurance on the Contractor's behalf and shall be entitled to be repaid by [the] Contractor for any premiums paid therefor."

B.    The Lawsuit

Christopher Lovely, Steven Adams, Robert DeFoe, Charles Van Curren, and Dustin Leavitt (the workers) all worked for UIC Construction on the project. On May 8, 2014, some of UIC's employees sought medical care after breathing fumes with a strong odor. According to a Baker Petrolite incident report, an employee of Baker

Petrolite "was cleaning a tote that had last contained [a corrosion inhibitor] which contains mercaptan and is very odorous." The "odor" from cleaning the tote was "transferred" from the existing Baker Petrolite facility "into the new facility via [the] vent discharge, the open windows/doors of the new facility and the prevailing wind direction." According to the Material Safety Data Sheet, the corrosion inhibitor is considered hazardous and when inhaled can cause a number of adverse health effects, both acute and chronic, including headaches, dizziness, and nausea. The workers contended that they suffered chronic health problems as a result of their exposure.

The workers received workers' compensation from UIC Construction, their employer. They later sued Baker Hughes, Baker Hughes Oilfield Operations, and Baker Petrolite (collectively the corporations), alleging negligence causes of action.

The three corporations filed several summary judgment motions. One of them contended that the workers' claims were barred because each of the corporations was a "project owner" as defined by AS 23.30.045[5] and thus exempt from liability under AS 23.30.055.[6] The corporations asserted that they all met the statutory definition of "project owner" because "[t]he Contract states the Owners of the project are [Baker Hughes Oilfield Operations] and any of its affiliated companies, including parent and

---

[5]     Alaska Statute 23.30.045(a), which requires employers to "secure the payment to employees of the compensation payable under [the Act]," further provides: "If the employer is a contractor and fails to secure the payment of compensation to its employees or the employees of a subcontractor, the project owner is liable for and shall secure the payment of the compensation to employees of the contractor and employees of a subcontractor, as applicable." "Project owner" is defined as "a person who, in the course of the person's business, engages the services of a contractor and who enjoys the beneficial use of the work." AS 23.30.045(f)(2).

[6]     Alaska Statute 23.30.055 provides that workers' compensation is an injured employee's exclusive remedy against an employer and other persons who, by statute, are "liable for or potentially liable for securing payment of compensation."

subsidiary companies." Relying on the contract provisions related to indemnification and the designation of additional insureds, the corporations contended that if any of them was "a statutory 'project owner,' each affiliated company [was] as well."

The corporations presented other arguments in support of each one's status as a project owner. They contended that Baker Hughes Oilfield Operations "was the first Owner by virtue of its unique Project role," pointing to the testimony of a Baker Hughes Oilfield Operations employee who was "tasked with initiating Baker Hughes-related construction projects, and developing new Baker Hughes-related facilities." They argued that Baker Petrolite was a project owner because Baker Hughes Oilfield Operations had assigned all of its rights under the contract to Baker Petrolite "as of October 31, 2013, well before the May 8, 2014 event" that prompted the lawsuit. They attached a copy of an undated assignment with an October 31, 2013 effective date, signed by the same person, David Emerson, on behalf of both corporations. They also contended that Baker Petrolite was "the operator of the site" and "enjoyed the intended use of UIC's construction" of the facility. As for the parent corporation, Baker Hughes, the corporations asserted that "[p]arent and affiliated companies . . . receive a number of benefits from a successful subsidiary company," relying on a law review note that primarily discussed subsidiary companies in the context of federal patent law.[7]

The workers responded that "the actual facts" did not support the corporations' arguments. According to the workers, the only corporation that might qualify as a project owner was Baker Hughes Oilfield Operations, which they said owned the land and which had entered into the construction contract as "the Owner." They contended that nothing in the Alaska workers' compensation statute "was intended to

---

[7]    Bryce Young, Note, *Recovering Lost Profits: The Resurrection of Subsidiaries (Is There Life on* Mars*?)*, 8 U. St. Thomas L.J. 275 (2011).

allow 'project owners' to daisy chain every related company into the designation of 'project owner.' "

The workers disputed whether the document assigning the contract to Baker Petrolite had actually been signed on its effective date — October 31, 2013 — pointing out that it was undated and "signed by the same person for both parties." To support their argument that the purported assignment had no effect on actual operations, they attached deposition testimony from an employee of Baker Hughes Oilfield Operations who confirmed that it was his decision to hire UIC Construction; that he was "the project manager"; that "the only oversight authority of the construction project was through [his] office"; and that he visited the construction site "every four to six weeks for progress meetings or construction review."

The superior court granted summary judgment to the corporations. Beginning with the statutory definition of "project owner,"[8] the court found there to be "no dispute" that all three corporations "enjoy[ed] the beneficial use of" UIC Construction's work. Turning to whether each of them had "engaged the [contractor's] services," the court found it to be undisputed that UIC Construction "was contracted to perform work for the benefit of" all three corporations; that the June 2013 letter showed Baker Petrolite contracting with UIC Construction "for preliminary work"; that all three corporations "require[d] UIC to indemnify them from potential workplace liability"; and that the contract had been assigned by Baker Hughes Oilfield Operations to Baker Petrolite. The court considered these undisputed facts sufficient to conclude that all three corporations had "engaged the [contractor's] services." The court found that the date the assignment was signed, though disputed, was irrelevant because "even if the transfer

---

[8]     AS 23.30.045(f)(2) (defining "project owner" as "a person who, in the course of the person's business, engages the services of a contractor and who enjoys the beneficial use of the work").

took place after the date of injury, [the assignment] is still evidence consistent with [Baker Petrolite] being the benef[iciary] of the work and in the chain of engaging UIC's services."

The court then concluded that all three corporations were potentially liable for workers' compensation covering UIC Construction's employees: "If [Baker Hughes Oilfield Operations] were insolvent and unable to provide the workers' compensation, [Baker Petrolite and Baker Hughes] are both potentially liable." In support of this conclusion the court cited the same facts noted above and "the indemnification clause in the Contract," noting — without reference to specific contract language — that "it is difficult to imagine [Baker Hughes] not being liable to provide workers' compensation insurance if its subsidiary company were underfunded." The court observed that the workers had "not shown, nor could they show, that under no circumstances could [the three Baker Hughes corporations] never face such liability." The court concluded that the three corporations were therefore "excluded from additional liability" under AS 23.30.055 as project owners. It granted summary judgment to the corporations and later entered final judgment in their favor.

The workers appeal.

III. STANDARDS OF REVIEW

We review a grant of summary judgment de novo, drawing all factual inferences in favor of the nonmoving party.[9] We interpret a statute using our independent judgment, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[10] As a general rule, contract interpretation is a question

---

[9] *Cornelison v. TIG Ins.*, 376 P.3d 1255, 1267 (Alaska 2016).

[10] *Bachner Co. v. State*, 387 P.3d 16, 20 (Alaska 2016) (quoting *Roberson v. Southwood Manor Assocs., LLC*, 249 P.3d 1059, 1060 (Alaska 2011)).

of law that we review de novo, but such interpretation can involve fact questions "when the meaning of contract language is dependent on conflicting extrinsic evidence."[11] In such circumstances, the fact questions may preclude summary judgment on the contract's meaning.[12]

## IV. DISCUSSION

### A. Only An Entity That Meets The Definition Set Out In AS 23.30.045(f) Is A Project Owner Protected By The Exclusive Liability Provision Of AS 23.30.055.

The Alaska Workers' Compensation Act provides that an employee's exclusive remedy against the employer for a workplace injury is for benefits under the Act,[13] but it also allows the employee to pursue tort actions against third parties who may bear some responsibility.[14] In 2004 the legislature amended the Act, expanding the category of entities potentially liable for workers' compensation and therefore protected from third-party tort claims by the exclusive remedy provision.[15] As amended, the exclusive remedy provision protects not only the employer, as defined in AS 23.30.395, but also any person "who, *under AS 23.30.045(a)*, is liable for or potentially liable for securing payment of compensation."[16] The corporations do not argue that they are the workers' "employer" as that term is defined in AS 23.30.395, leaving only

---

[11]   *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1000 n.1 (Alaska 2004).

[12]   *See id.* at 1004 (setting out conflicting testimony about meaning of clause and observing that genuine issue of fact existed as to its meaning).

[13]   AS 23.30.055.

[14]   AS 23.30.015.

[15]   Ch. 80, SLA 2004.

[16]   AS 23.30.055 (emphasis added).

AS 23.30.045(a) — extending liability to a "project owner" — as a possible basis for the corporations' asserted exclusive liability defense. In this case we must determine whether corporations that are not parties to a contract, but are related to a corporation that is a party, may be "project owners" under the Act and therefore protected from liability to the same extent as employers.

The beginning point for our statutory analysis is AS 23.30.045(a), which provides:

> If the employer is a subcontractor and fails to secure the payment of compensation to its employees, the contractor is liable for and shall secure the payment of the compensation to employees of the subcontractor. If the employer is a contractor and fails to secure the payment of compensation to its employees or the employees of a subcontractor, the project owner is liable for and shall secure the payment of the compensation to employees of the contractor and employees of a subcontractor, as applicable.

The terms used in AS 23.30.045(a) are defined in AS 23.30.045(f):

> In this section,
>
> (1) "contractor" means a person who undertakes by contract performance of certain work for another but does not include a vendor whose primary business is the sale or leasing of tools, equipment, other goods, or property;
>
> (2) "project owner" means a person who, in the course of the person's business, engages the services of a contractor and who enjoys the beneficial use of the work;
>
> (3) "subcontractor" means a person to whom a contractor sublets all or part of the initial undertaking.

We construe these definitions together because they are part of the same statute and refer

to each other.[17]  To be a "project owner," the entity in question must "engage[] the services of a contractor."  A "contractor" is an entity that "undertakes by contract certain work for another."  A "subcontractor" enters the mix only if the "contractor" has "sublet" part of the work it assumed by contract.

The parties dispute what it means to "engage the services of a contractor." The workers argue that the "common understanding" of the phrase refers to "the person who actual[ly] makes the agreement with the contractor," and they maintain that only Baker Hughes Oilfield Operations — the named "Owner" under the contract — can meet the statutory definition.  The corporations argue that they are all project owners because each one participated in some way in the construction project and their participation shows that they "engaged the services of" UIC Construction as required by the "project owner" definition.  They maintain that the legislature did not limit "project owner" status to those who have a contractual relationship with a contractor, but they provide no legal analysis to support this assertion.  Instead, they describe the extent of each corporation's involvement in the project, pointing out, for example, that Baker Hughes's "worldwide architect . . . put together the initial site plan and building layout" and that Baker Petrolite's "management met with [Baker Hughes Oilfield Operations] to develop a general construction plan."

"We construe statutes according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its

---

[17]    "[W]hen construing a statute, 'we must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole.' " *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1127 (Alaska 2017) (quoting *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007)).

purpose."[18]  When the legislature amended the statute in 2004 to add the definition of "project owner," it defined the term in relation to the definition of "contractor": A "project owner" is "a person who, in the course of the person's business, engages the services of *a contractor* and who enjoys the beneficial use of the work."[19]  The definition of "contractor" requires a contract: In AS 23.30.045, " 'contractor' means a person who *undertakes by contract* performance of certain work for another . . . ."[20]

We also consider the meaning of "engage."  When used as a transitive verb, "engage" means "[t]o obtain or contract for the services of; employ."[21]  As an intransitive verb, "engage" can mean "[t]o involve oneself or become occupied; participate: *engage in conversation*."[22]  This latter meaning appears to be the way the corporations ask us to construe the word; that is, that they were all "engaged," to one degree or another, in the construction project.  But the statute uses "engage" as a transitive verb; it has a direct object, "the services."  The relevant question is not "Was this corporation engaged in the construction project?"[23] but rather "Did this corporation engage the services of the contractor?"  The common meaning of "engage" in its most relevant sense, as a transitive verb, highlights the importance of a contractual relationship between "project owner"

---

[18]     *Id.* at 1121.

[19]     Ch. 80, § 3, SLA 2004; AS 23.30.045(f)(2) (emphasis added).

[20]     AS 23.30.045(f)(1) (emphasis added).

[21]     *Engage*, THE AMERICAN HERITAGE DICTIONARY (5th ed. 2020).

[22]     *Id.* (emphasis in original).

[23]     A variety of entities — for example, subcontractors, suppliers, inspectors, licensing authorities, and affiliates of the contracting parties — may be engaged in a construction project to some degree without having "engaged the services of the contractor."

and "contractor." Reading the statutory definitions together, we must conclude that a project owner is someone who engages the services of — that is, *contracts with* — a person to perform specific work and enjoys the beneficial use of that work.

The legislative history supports this interpretation of AS 23.30.045(f). The sponsor of the 2004 legislation explained that under the amendments, "the responsibility for payment of workers' compensation is extended up *the chain of contracts* to include project owners"; he also indicated that the exclusive liability provision would extend to "those parties that are upstream in *the chain of contracts* from the employer of the injured employee."[24] The phrase "chain of contracts" implies linked contractual relationships. The corporations point to nothing in the legislative history that supports their different interpretation of the statute. Nor do they explain how the participation of Baker Hughes and Baker Petrolite in the planning process would create any legal obligations between them and UIC Construction, the statutorily-defined "contractor," which undertook "by contract performance of certain work for"[25] Baker Hughes Oilfield Operations.

The legislature has expressed an intent that the Act be interpreted to provide the "predictable delivery" of compensation coverage to injured workers "at a reasonable cost" to employers who provide this coverage.[26] Construing the statute as the corporations suggest would undermine these goals. When determining potential liability for compensation depends on the interactions of corporations without clear lines of legal

---

[24] Minutes, Sen. Labor & Commerce Comm., Hearing on Senate Bill (S.B.) 323, 23rd Leg., 2d Sess., 20-21 (Mar. 4, 2004) (emphasis added), http://www.akleg.gov/PDF/23/M/SL!C2004-03-041332.PDF, (statement of Sen. Ralph Seekins, sponsor of S.B. 323).

[25] AS 23.30.045(f)(1).

[26] AS 23.30.001(1).

responsibility, coverage for workers and for others involved in the compensation process is less predictable. And because employers and their workers' compensation carriers can recover all or part of the compensation benefits they have paid from a successful third-party damages claim, expanding the number of entities that are exempt from those claims without express legislative direction to do so decreases the opportunities for employers and carriers to offset their payments, effectively increasing the cost of workers' compensation.

The corporations argue that the 2004 amendments "protected potentially liable parties from 'double-dipping' by injured workers," citing our decision in *Schiel v. Union Oil Co. of California*.[27] We interpreted "double dipping" in the legislative history as referring to a situation in which a contractor or subcontractor first paid workers' compensation to its employee and then, "because of an indemnification agreement, also had to defend against a tort suit the worker filed against the project owner."[28] But "project owner" remains a statutorily-defined term; an entity does not become a project owner simply because of an agreement between two *other* parties that the entity will be indemnified if sued.

In all the cases in which we have considered and applied the "project owner" definition, the project owner was a contracting party. In *Schiel* we discussed the "master services contract between UNOCAL [which we assumed to be the project owner] and Peak," the injured worker's direct employer.[29] We set out the chain of contracts in *Nelson v. Municipality of Anchorage*, in which the Municipality contracted with one business for specific work and that business subcontracted part of the work to

---

[27]    219 P.3d 1025 (Alaska 2009).

[28]    *Id.* at 1033.

[29]    *Id.* at 1032-33.

the injured employee's employer.[30]  We mentioned pertinent contract provisions when discussing "project owner" status in *Anderson v. Alyeska Pipeline Service Co.*[31]  And in *Trudell v. Hibbert* we wrote that "the [project owners] contracted with" the injured worker's employer for building repairs.[32]

The only contract the parties identified and discussed here was the April 2013 construction contract signed by UIC Construction and Baker Hughes Oilfield Operations, which incorporated the June 2013 letter memorializing what the superior court called a preliminary agreement between Baker Petrolite and UIC Construction. UIC Construction is the only "contractor" whose services the corporations contend they engaged.  On remand the superior court must consider whether the evidence shows that each of the three Baker Hughes corporations was a party to that contract.

B.     The Contract's Indemnity Provisions Are Irrelevant To Whether A Baker Hughes Entity Is A Project Owner Under The Statutory Definition.

The foregoing analysis is based on the language of the Act and does not consider the import, if any, of the contract's indemnity provisions, which form a major part of the corporations' argument.  The corporations' contract analysis appears to begin with language from the Act's exclusive remedy provision, AS 23.30.055.  The statute states that its protection extends to "employers" as defined in AS 23.30.395 and also includes "a person who, under AS 23.30.045(a), is liable for or potentially liable for securing payment of compensation."  According to the corporations, "it is clear [from the statutes] that any entity who is potentially liable for workers' compensation benefit

---

[30]     267 P.3d 636, 638 (Alaska 2011).

[31]     234 P.3d 1282, 1284, 1288 (Alaska 2010).

[32]     272 P.3d 331, 333 (Alaska 2012), *vacated in part on other grounds on reh'g*, 299 P.3d 1279 (Alaska 2013).

payments to employees, regardless of whether the entity was engaged in contract negotiations, cannot be liable in tort."

We disagree. The persons who "cannot be liable in tort" are those who "under AS 23.30.045(a)" are "liable for or potentially liable for securing payment of compensation"; that is, persons who are employers or project owners as defined by statute. Being "liable for or potentially liable for securing payment of compensation" does not by itself make someone a "project owner"; rather, being a "project owner," as defined by statute, makes someone "liable for or potentially liable for securing payment of compensation." The analysis begins with the statutory definitions, not whether someone is "liable . . . or potentially liable." Theoretically, someone could assume liability for workers' compensation payments by contract, as the corporations argue they did here, but not be a "project owner" as statutorily defined and not be entitled to the protection of the exclusive remedy provision. In short, regardless of how the corporations defined themselves by contract, and regardless of the obligations they claim to have assumed, whether they are protected from third-party liability as project owners still depends on whether they satisfy the statutory definition.[33]

Furthermore, the corporations' contract arguments do not support their claim that all three are "liable . . . or potentially liable" for the payment of workers' compensation. The superior court accepted this argument; it concluded that all three corporations "would be potentially liable to provide workers' compensation insurance" if UIC Construction failed to do so. The court wrote that Baker Hughes's "potential liability [was] acknowledged within . . . the indemnification clause in the Contract," and it apparently relied on the same indemnification provisions to support its conclusion that

---

[33]     *See Anderson*, 234 P.3d at 1288 ("Because Alyeska satisfies the definition of 'project owner' in AS 23.30.145(f)(2), it is covered by the exclusive liability provisions of AS 23.30.055.").

Baker Petrolite was potentially liable as well. The corporations urge us to adopt the same rationale. They ask, "Where *else* would one consider a party's potential liability, save for first examining the express or implied indemnity provisions in the contract?" (Emphasis in original.)

We have accordingly examined the indemnity provisions in the contract, but we find nothing in them to support the corporations' argument. All the obligations identified in § 3.18, the indemnity section — "to indemnify, defend and hold harmless" from various claims and causes of action — flowed in the same direction: from the Contractor to the Owner. Nowhere in these provisions was the "potential liability" of any Baker Hughes entity for workers' compensation "acknowledged"; indeed, under these provisions the Owner assumed no obligation to the Contractor whatsoever. A different part of the contract permitted, but did not require, "the Owner" (i.e., Baker Hughes Oilfield Operations) to buy workers' compensation insurance if the "Contractor" failed to provide proof that it had done so, but this cannot be construed as *requiring* all three corporations, even those not parties to the contract, to provide workers' compensation.[34]

We find no support in the contract's indemnity provisions for the corporations' argument that all three of them were project owners.

---

[34]    At oral argument on this appeal the corporations relied not just on the contractual indemnity provisions but also on AS 45.45.900, which they had not cited in the superior court or in their appellees' brief. The statute prohibits contractual indemnity provisions that "purport[] to indemnify the promisee" against loss "from the sole negligence or wilful misconduct of the promisee." Because this argument was not briefed, we do not consider it further, *State v. Pub. Safety Emps. Ass'n*, 257 P.3d 151, 165 (Alaska 2011) ("[A]rguments are waived on appeal if they are inadequately briefed.").

### C. Material Factual Disputes Also Precluded Summary Judgment.

We comment briefly on two documents that the superior court found to support the corporations' arguments on summary judgment; we believe both of them implicate factual issues that should have precluded the court's reliance on them. First, the corporations held out the assignment as proof that Baker Petrolite was a project owner; the superior court stated that the workers did "not dispute" that the assignment "transferred the Contract from [Baker Hughes Oilfield Operations] to [Baker Petrolite]" at some point during construction, and that although the date was disputed, the fact of the assignment was itself "evidence consistent with [Baker Petrolite] being the benef[iciary] of the work and in the chain of engaging UIC's services."

But in fact the workers did argue that the contract had not been assigned at all because the corporations' actions belied an assignment, and on appeal they continue to question both the validity of the assignment and the date any assignment took place. A Baker Hughes Oilfield Operations employee testified that he provided the only oversight authority on the project from start to finish, purported assignment notwithstanding. The assignment gives no indication that UIC Construction consented to it, even though the April 2013 contract prohibited assignment without the other party's written consent.[35] And the assignment says it was "executed by Assignor and Assignee . . . on the dates set forth below," but there is no date next to Emerson's two signatures on behalf of the two parties. The validity of the assignment and the date it was executed appear to be material to determining which corporation was a "project owner" at the time of the accident, and the employees presented enough evidence to show that these facts were genuinely disputed.

---

[35]    The only exception was that the "Owner" could, without written consent, assign the contract "to a lender providing construction financing for the Project."

We also see fact issues surrounding the June 2013 letter referencing "a preliminary agreement." The superior court interpreted the letter as coming from Baker Hughes Oilfield Operations but as proving that Baker Petrolite "contracted with UIC for preliminary work," as the letter recites. But the only document in the record identified as a "preliminary agreement" is between Baker Hughes Oilfield Operations and UIC Construction; Baker Petrolite is not a party. Furthermore, the June 2013 letter was incorporated into the construction contract as one of the "Contract Documents," and as such it is inoperative to the extent it conflicts with the contract's terms — one of which, as noted above, provides that "[t]he Contract Documents shall not be construed to create a contractual relationship of any kind . . . between any persons or entities other than the Owner and the Contractor."

In sum, the June 2013 letter by itself does not prove the existence of a contractual relationship between Baker Petrolite and UIC Construction, despite its recitals. And even if there were a Baker Petrolite contract for "preliminary work," it would appear to be relevant to the workers' claims only if they were doing that "preliminary work," under that contract, at the time they were injured. In other words, a finding that Baker Petrolite was a project owner for different work under an earlier contract would not mean it was a project owner for purposes of this suit.

The parties may well identify other fact issues that need to be addressed on remand in the course of determining which of the Baker Hughes entities was a project owner.

## V.    CONCLUSION

We REVERSE the superior court's grant of summary judgment and REMAND the case to the superior court for further proceedings consistent with this opinion.